CONNECTICUT NATIONAL BANK *v.*
ROBERT A. GIACOMI

CONNECTICUT NATIONAL BANK *v.*
JOSEPH J. SANTOPIETRO

CONNECTICUT NATIONAL BANK *v.*
JOSEPH A. SANTORO ET AL.

CONNECTICUT NATIONAL BANK *v.*
JACK R. GIACOMI

CONNECTICUT NATIONAL BANK *v.*
JOHN J. DEPASTINO ET AL.

CONNECTICUT NATIONAL BANK *v.*
ROBERT R. ROSA
(SC 15539)

Borden, Berdon, Norcott, Katz and Ment, Js.

Argued January 14—officially released July 22, 1997

*Darrell K. Fennell*, with whom, on the brief, were *Michael Winger* and *Philip M. Chiappone*, for the appellant (plaintiff).

*James E. Hartley, Jr.*, for the appellees (defendant Robert A. Giacomi et al.).

*Richard P. Weinstein*, with whom, on the brief, were *Peter B. Rustin* and *Nathan A. Schatz*, for the appellees (defendant Joseph A. Santoro et al.).

*Eileen McGann* filed a brief for the appellee (defendant Joseph J. Santopietro).

BORDEN, J. The primary issue in this appeal is whether, for the purposes of General Statutes (Rev. to 1993) § 36-498 (c) of the Connecticut Uniform Securities Act (CUSA),[1] a bank can be the agent of a person who is liable for fraudulent conduct in connection with a securities transaction under § 36-498 (a).[2] The plaintiff,

---

[1] General Statutes (Rev. to 1993) § 36-498 (c) provides: "Every person who directly or indirectly controls a person liable under subsections (a) and (b) of this section, every partner, officer, or director of such a person, every person occupying a similar status or performing similar functions, every employee of such a person who materially aids in the act or transaction constituting the violation and every broker-dealer or agent who materially aids in the act or transaction constituting the violation are also liable jointly and severally with and to the same extent as such person, unless the person who is so liable sustains the burden of proof that he did not know, and in exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist. There shall be contribution as in cases of contract among the several persons so liable."

In 1995, the entirety of CUSA was transferred from chapter 662 to chapter 672a and renumbered. Due to this transfer, the above provision is now codified in similar language at General Statutes § 36b-29 (c). As was the practice in *Connecticut National Bank* v. *Giacomi*, 233 Conn. 304, 306 n.1, 659 A.2d 1166 (1995), we refer to the relevant provisions of CUSA according to their designations in effect during the period of time at issue in this case.

[2] General Statutes (Rev. to 1993) § 36-498 (a) provides: "Any person who: (1) Offers or sells a security in violation of subsection (a) of section 36-374, 36-485 or subsection (b) of section 36-493 or of any regulation or order under section 36-491 which requires the affirmative approval of sales literature before it is used, or of any condition imposed under subsection (d) of section 36-487 or subsection (g) or (h) of section 36-488; or (2) offers or sells a security by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, the buyer not knowing of the untruth or omission, and who does not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the untruth or omission, is liable to the person buying the security from him, who may sue either at law or in equity to recover the consideration paid for the security, together with interest at eight per cent per year from the date of payment, costs and reasonable attorneys' fees, less the amount of any income received on the security, upon the tender of the security, or for damages if he no longer owns the security." This section is now codified in substantially similar language at General Statutes § 36b-29 (a).

Connecticut National Bank,[3] brought separate actions, as payee, against the defendants,[4] as makers of promissory notes that were payable on demand. All of the defendants, except for Valerie DePastino,[5] were among the group of investors in the now defunct Great Rings Limited Partnership (Great Rings). Although the defendants who had invested in Great Rings do not deny that they had executed the notes or that demand had properly been made, they raised, inter alia, the special defense under § 36-498 (g)[6] that the promissory notes are unenforceable as contracts in violation of CUSA. Valerie S. DePastino claimed[7] that she was discharged from the obligation on the note because the note was void for want of consideration, and because the note was an incomplete instrument that subsequently had been completed in an unauthorized manner in violation of General Statutes (Rev. to 1991) §§ 42a-3-115 and 42a-3-407[8] of the Uniform Commercial Code (UCC).

[3] Connecticut National Bank now operates under the name of Fleet Bank.

[4] The defendants are Robert A. Giacomi, Jack R. Giacomi, Joseph J. Santopietro, John J. DePastino, Valerie S. DePastino, Joseph A. Santoro, Hope M. Santoro and Robert R. Rosa. Robert Giacomi and Jack Giacomi (Giacomi defendants) joined in a brief to this court. Joseph and Hope Santoro, Robert Rosa and John DePastino (Santoro defendants) also joined in a brief to this court. Santopietro filed his own brief. Valerie DePastino did not file a brief.

[5] Valerie DePastino was not an investor in Great Rings. The proceeds from her note were used to purchase shares of Great Rings in the name of her husband, John DePastino.

[6] General Statutes (Rev. to 1993) § 36-498 (g) provides: "No person who has made or engaged in the performance of any contract in violation of any provision of this chapter or any regulation or order hereunder, or who has acquired any purported right under any such contract with knowledge of the facts by reason of which its making or performance was in violation, may base any cause of action on the contract." This subsection is now codified in substantially similar language at General Statutes § 36b-29 (h).

[7] Valerie DePastino also asserted a special defense under the common law of contract. The trial court concluded, however, that "the [Uniform Commercial Code] provisions concerning incomplete and altered instruments . . . must be held to preempt the field," and therefore, dismissed her common-law claim.

[8] General Statutes (Rev. to 1991) § 42a-3-115 provides: "(1) When a paper whose contents at the time of signing show that it is intended to become

After a consolidated court trial, the trial court, *Blue, J.*, concluded that the aiding and abetting of another person's securities fraud forms an independent basis for the imposition of liability under CUSA. Applying that rationale, the trial court found that the plaintiff had aided and abetted Great Rings' fraudulent conduct in connection with the defendants' purchase of securities from Great Rings, and consequently determined that the plaintiff's conduct was an affirmative defense to the defendants' liability on the notes under § 36-498 (g).[9] The plaintiff appealed. In *Connecticut National Bank* v. *Giacomi*, 233 Conn. 304, 339, 659 A.2d 1166 (1995), we reversed the judgments of the trial court, concluding that "a person who aids and abets another person's fraudulent conduct in connection with a secu-

---

an instrument is signed while still incomplete in any necessary respect it cannot be enforced until completed, but when it is completed in accordance with authority given it is effective as completed.

"(2) If the completion is unauthorized the rules as to material alteration provided in section 42a-3-407 apply, even though the paper was not delivered by the maker or drawer; but the burden of establishing that any completion is unauthorized is on the party so asserting."

General Statutes (Rev. to 1991) § 42a-3-407 provides: "(1) Any alteration of an instrument is material which changes the contract of any party thereto in any respect, including any such change in (a) the number or relations of the parties; or (b) an incomplete instrument, by completing it otherwise than as authorized; or (c) the writing as signed, by adding to it or by removing any part of it.

"(2) As against any person other than a subsequent holder in due course (a) alteration by the holder which is both fraudulent and material discharges any party whose contract is thereby changed unless that party assents or is precluded from asserting the defense; (b) no other alteration discharges any party and the instrument may be enforced according to its original tenor, or as to incomplete instruments according to the authority given.

"(3) A subsequent holder in due course may in all cases enforce the instrument according to its original tenor, and when an incomplete instrument has been completed, he may enforce it as completed."

[9] In its first memorandum of decision, the trial court did not expressly identify the provision in CUSA under which it found aiding and abetting liability. Pursuant to a motion to rectify the appeal, the trial court clarified its decision by stating: "Section 36-472 sets forth the substantive provisions on which I relied in making my decision."

rities transaction has not violated [General Statutes (Rev. to 1993)] § 36-472." Because the trial court's factual findings were not sufficient for us to conclude, as a matter of law, that the plaintiff's conduct constituted a violation of § 36-498; id.; we remanded the case to the trial court "to consider the defendants' argument that § 36-498 (a) and (c) provide for a form of aider and abettor liability and to decide the merits of the defendants' other special defenses."[10] Id.

On remand, the trial court, *Blue, J.*, received briefs from the parties and, after holding a hearing, issued a second memorandum of decision.[11] In part III of its second memorandum of decision, the court stated its decision in the case. The court also made alternate findings of fact and conclusions of law, however, in part IV of its second memorandum of decision. The alternate analyses were discussed in the interests of judicial economy in the event that a reviewing court disagreed with the trial court's conclusions in part III. We discuss the trial court's decision and alternate conclusions in detail.

As was the case in the trial court's first decision, the court concluded in its second decision that § 36-498 (g)

---

[10] We noted, however, that "[b]ecause the trial court rejected the defendants' counterclaims and they did not cross appeal on this aspect of the trial court's decision, the remand will only involve the trial court's consideration of the defendants' remaining special defenses." *Connecticut National Bank* v. *Giacomi*, supra, 233 Conn. 339–40 n.34.

[11] Judge Blue first held a hearing to determine whether he was presumptively disqualified from continuing with the case pursuant to General Statutes § 51-183c, which provides in relevant part: "No judge of any court who tried a case without a jury in which a new trial is granted, or in which the judgment is reversed by the Supreme Court, may again try the case. . . ." None of the parties contended that § 51-183c applied to this remand. Judge Blue also determined that, although the first judgment had been reversed, in the absence of the presentation of any additional evidence, his function was simply to find additional facts from the evidence already presented, and reach additional legal conclusions, and that, therefore, his function was not " 'again [to] try the case.' " No party has challenged this conclusion on appeal.

provided an affirmative defense to the defendants if the plaintiff had violated a provision of CUSA. In its second decision, however, the court concluded that the plaintiff had made its contracts in violation of § 36-498 (c) as an agent of Great Rings " 'who materially [aided] in the act or transaction constituting the violation.' " After concluding that the plaintiff was an agent of Great Rings, the court analyzed which transactions in violation of CUSA the plaintiff had materially aided. The court concluded that the plaintiff had materially aided in a violation of General Statutes (Rev. to 1993) § 36-485, a registration provision in CUSA, which is incorporated into § 36-498 (a) (1). As the last element in this analysis, the court found that the plaintiff had not sustained its burden of proof under § 36-498 (c) that " '[it] did not know, and in [the] exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist.' " On the basis of its findings, the court concluded that all of the defendants had an affirmative defense pursuant to § 36-498 (g) because the plaintiff had made its contracts in violation of a provision in CUSA.[12]

In part IV of its second memorandum of decision, the trial court made additional findings of fact and alternate conclusions of law. The trial court concluded that if a reviewing court were to decide either that there had not been a violation of § 36-498 (a) (1), or that the plaintiff had not materially aided in such a violation, some of the defendants would nonetheless have an affirmative defense under its alternate conclusion, in which the court also relied on its determinations that § 36-498 (g) provided an affirmative defense for the

---

[12] As was the case in the trial court's first decision, the court applied this affirmative defense to Valerie DePastino regardless of the fact that she had not claimed it. Because there has been no objection to the fact that the trial court treated her as having raised such a defense, our analysis of the other defendants' CUSA claims applies equally to her. See *Connecticut National Bank* v. *Giacomi*, supra, 233 Conn. 307 n.4.

defendants and that the plaintiff was the agent of Great Rings. Following this alternate course, the court, however, concluded that the plaintiff had materially aided Great Rings in offering or selling a security by means of an untrue statement of a material fact or by the omission of a material fact in violation of § 36-498 (a) (2). See footnote 2 of this opinion. Because one element of a § 36-498 (a) (2) violation requires a finding concerning the buyer's state of mind as to the untruth or omission complained of, the trial court made additional findings of fact relevant to this element. Ultimately, it found that Robert Giacomi, Jack Giacomi, Joseph and Hope Santoro and Robert Rosa had sustained their separate burdens of proof that they "did not know, and in the exercise of reasonable care, could not have known of the untruths and omissions" when they purchased their interests in Great Rings.[13] As the last point in this analysis, the court found that the plaintiff had not sustained its burden of proof that " '[it] did not know, and in [the] exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist.' " At this point in its alternate conclusion, the court determined that the plaintiff "[was] barred by § 36-498 (g) from pursuing its causes of action against Robert Giacomi, Jack Giacomi, Joseph Santoro, Hope Santoro, and Robert Rosa."

The trial court, however, continued along this alternate course by analyzing the remaining affirmative defenses presented by Santopietro and John and Valerie DePastino, who had failed to sustain their burdens of proof under a § 36-498 (a) (2) violation. With respect to Santopietro and John DePastino, the court concluded that they had failed to establish any of the special defenses that they had asserted.[14]

---

[13] The trial court found also that Santopietro and John and Valerie DePastino had not sustained their burdens of proof with respect to this element.

[14] The trial court noted that the first special defense (the plaintiff knew or should have known of the CUSA violations), the second special defense

With respect to Valerie DePastino, however, the trial court concluded that she had a defense on the note pursuant to §§ 42a-3-115 and 42a-3-407. The court first determined that her note was an incomplete instrument that had been completed in an unauthorized manner in violation of § 42a-3-115. Then, pursuant to § 42a-3-407,

(the plaintiff aided and abetted the fraudulent conduct of the general partners of Great Rings), the eighth special defense (civil conspiracy to violate CUSA), and the tenth special defense (the plaintiff's conduct renders its claim unenforceable under § 36-498 [g]) are viable only if other substantive CUSA provisions are violated.

The court dismissed: (1) the ninth special defense (alleging a violation of § 36-498 as a whole) because it was too broad to be sensibly analyzed; (2) the twelfth special defense (claiming attorneys' fees) because the claim was not a special defense; (3) the fourth special defense (the plaintiff's actions render the note rescindable) because it was not briefed; and (4) the thirteenth special defense (claiming negligence) because it also was not briefed. The court found the fourteenth special defense (alleging a violation of the plaintiff's internal rules) unpersuasive because no authority had been submitted "suggesting that a violation of a lending bank's internal rules is by itself sufficient to bar an action on a note."

The court also concluded that the first, third, seventh and eighth special defenses essentially allege fraud, but that Santopietro and John DePastino had not sustained their burden of proving that the notes were procured by fraud, either under a clear and convincing standard or a preponderance of the evidence standard.

The court considered more fully their second special defense of aiding and abetting as it related to § 36-498 (a) (2), which was amended in 1993 to include those who materially assist any person who offers or sells a security by fraudulent means. See Public Acts 1993, No. 93-169, § 1. The court concluded, however, that Santopietro and John DePastino would still be required to prove that they did not know of the untruth or omission, or in the exercise or reasonable care could not have known of the untruth or omission. The court concluded that because they had not sustained this burden, the second special defense was invalid.

The sixth special defense asserted a violation of § 36-498 (b), which includes by reference General Statutes (Rev. to 1993) § 36-473 (a), (b) and (c). The court concluded that under subsection (a) of § 36-473, it could not find that "the [plaintiff] received any consideration primarily for its advice." It also concluded that because subsections (b) and (c) of § 36-473 restrict the activities of "investment advisors," and that the definition of "investment advisor" contained in General Statutes (Rev. to 1993) § 36-471 (6) (A) specifically excludes banks, the sixth special defense was also invalid.

Santopietro and John DePastino do not challenge these findings and conclusions.

the court determined that the alteration to the note was material and that the plaintiff was not a holder in due course. The court, however, could not find "from the evidence that the holder—i.e., [the plaintiff]—knew that the alteration here was unauthorized." The court concluded, therefore, that the instrument was to be enforced according to the authority given under § 42a-3-407 (2) (b), but that because Valerie DePastino had not authorized any payment, the note could not be enforced. Because the court had already concluded that the plaintiff was not a holder in due course, the court rejected the plaintiff's argument that Valerie DePastino was negligent in signing the note, and that therefore the plaintiff, as a holder in due course, took free from her claim of unauthorized completion.

The plaintiff appealed from this second judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to Practice Book § 4023 and General Statutes § 51-199 (c). We affirm the judgment of the trial court with respect to Robert Giacomi, Jack Giacomi, Joseph and Hope Santoro, Robert Rosa and Valerie DePastino. With respect to Santopietro and John DePastino, we reverse the judgment of the trial court and remand the cases with direction to render judgment in favor of the plaintiff.

The relevant facts are as follows.[15] Great Rings was a real estate investment enterprise formed in 1988 under a certificate of limited partnership. In order to raise money to finance the Great Rings development, Kenneth Zak, a salesman for Great Rings, and the general partners planned that potential investors would borrow the entire purchase price of the Great Rings units from a bank, with the notes being directly payable to the

---

[15] In this opinion, we present only a summary of the facts. For a more complete presentation of the facts involved in this case, see *Connecticut National Bank* v. *Giacomi*, supra, 233 Conn. 308–14.

bank. Great Rings guaranteed an 8 percent return per year to the investors to offset the interest on the notes to the bank, and projected that within two years the partnership would have generated sufficient capital to pay off the principal of the notes. Therefore, the investment would raise millions, and without any personal expense, the investors could turn a sizeable profit.

Zak approached employees of the plaintiff to provide the financing to investors. In 1989, Zak met with Neal Fitzpatrick, then a senior vice president and regional manager of the plaintiff, who agreed that the plaintiff would loan money to those investors that it deemed qualified. Fitzpatrick then contacted two other employees of the plaintiff, Inta Ezerins in Hartford and James Truelove in Waterbury, who also agreed to provide financing by the plaintiff. The Great Rings partners entered into an agreement with People's Bank of Bridgeport, which agreed to hold subscription funds in escrow until subscriptions for twenty units were accepted. The agreement provided that People's Bank would return all the escrow funds directly to the investors if subscriptions for twenty units were not accepted by October 1, 1988.

The trial court made extensive findings about how particular individuals helped to solicit investors and facilitate the sale of the Great Rings units. Additionally, the trial court made findings about the plaintiff's involvement, primarily through Truelove, in the selling and financing of these defendants' units in Great Rings. Soon after escrow was broken in September, 1988, the investors' money disappeared. The trial court rejected the notion that this resulted from a downturn in the real estate market, and instead concluded that the investors' money had been stolen. In 1991, the plaintiff brought an action against the defendants on their promissory notes in these actions. Additional facts will be provided where needed.

On appeal from the trial court's second judgment, the plaintiff claims that the trial court improperly concluded that: (1) a bank can be an agent for the purposes of § 36-498 (c); (2) § 36-498 (g) can provide an affirmative defense to actions on facially legal promissory notes; and (3) Valerie DePastino was discharged from her note because of a subsequent unauthorized alteration of the note. With respect to the plaintiff's first claim, the Giacomi defendants and the Santoro defendants present three alternate grounds for affirmance of the trial court's judgment: (1) the plaintiff is primarily liable under § 36-498 (a) (2); (2) the plaintiff occupied a "similar status" or performed "similar functions" within the meaning of § 36-498 (c); and (3) the plaintiff is liable as a common-law aider and abettor. Santopietro claims, also as an alternate ground for affirmance, that the plaintiff was a "control person" within the meaning of § 36-498 (c).

We agree with the plaintiff on the first issue, namely, that a bank cannot be an agent for the purposes of § 36-498 (c), but we also agree with certain of the defendants that § 36-498 (a) (2) provides an alternate ground for affirmance as to them. We disagree with the plaintiff that § 36-498 (g) does not provide a defense on the promissory notes in question,[16] and with respect to Valerie DePastino, we conclude that various provisions of the UCC provide her with a defense to liability on the note that she signed.

---

[16] If we were to conclude that § 36-498 (g) does not provide a defense to facially legal promissory notes, the defendants' CUSA defenses would fail, and we would not need to consider whether the plaintiff had violated CUSA. Because we conclude, however, that § 36-498 (g) can provide a defense to the enforcement of facially legal promissory notes, and therefore is not dispositive of this case, and because we also conclude that the § 36-498 (g) defense is available to these defendants only if the notes were made in violation of CUSA, which is a fact-sensitive inquiry, we postpone our discussion of § 36-498 (g) until the factual circumstances surrounding each transaction have been presented in detail. See part III of this opinion.

I

The plaintiff initially claims that the trial court improperly concluded that the plaintiff was the agent of Great Rings. In its analysis of whether the plaintiff was an agent of the issuer, the trial court determined that the Great Rings developers were "issuers" and that the units they sold were "securities" as contemplated by General Statutes (Rev. to 1993) § 36-471 (2).[17] On the basis of the factual findings in its first memorandum of decision, the trial court subsequently determined that the plaintiff was the agent of Great Rings because it had "represented the Great Rings issuers in effecting or attempting to effect purchases or sales of securities."

The plaintiff claims that the definition of agent in CUSA does not include a bank.[18] In support of its claim, the plaintiff points to the statutory definition of "agent." Section 36-471 (2) provides: " 'Agent' means any *indi-*

---

[17] General Statutes (Rev. to 1993) § 36-471 (2) provides: " 'Agent' means any individual, other than a broker-dealer, who represents a broker-dealer or 'issuer', in effecting or attempting to effect purchases or sales of securities. 'Agent' shall not include an individual who represents an issuer in (A) effecting transactions in a security exempted by subdivision (1), (2), (3), (4), (6), (9), (10), (11), or (21) of subsection (a) of section 36-490, (B) effecting transactions exempted by subsection (b) of section 36-490, except for transactions exempted by subdivision (9) of said subsection and by subdivision (12) of said subsection, or (C) effecting transactions with existing employees, partners or directors of the issuer if no commission or other remuneration is paid or given directly or indirectly for soliciting any person in this state. 'Agent' shall not include such other persons not within the intent of this subsection as the commissioner may by regulation or order determine. A general partner, officer or director of a broker-dealer or issuer, or a person occupying a similar status or performing similar functions, is an agent only if he otherwise comes within this definition and any compensation that he receives is directly or indirectly related to purchases or sales of securities." This subsection is now codified in substantially similar language at General Statutes § 36b-3 (2).

[18] The plaintiff also claims that Great Rings did not control the plaintiff and that the plaintiff did not represent Great Rings. Because we conclude that a bank cannot be an agent for the purposes of § 36-498 (c), we need not reach these claims.

*vidual*, other than a broker-dealer, who represents a broker-dealer or 'issuer', in effecting or attempting to effect purchases or sales of securities. . . ." (Emphasis added.) The plaintiff contends that the term "individual" encompasses only natural persons, and not artificial entities, such as the plaintiff.

The defendants argue that, when interpreted in the broad context of the statute, the term "agent" can include an artificial entity. Specifically, they point to the use of the word "persons" later in the definition of "agent" to refer to those possibly within the definition of agent.[19] The defendants also contend that interpreting the term "agent" to include only natural persons would unduly limit the effectiveness of § 36-498 (c) and would thwart CUSA's overall goal of protecting the investing public from fraud.

We agree with the plaintiff that the term "agent" as defined in CUSA is confined to natural persons, and does not include artificial entities such as a bank. The plaintiff cannot, therefore, be considered an "agent" of Great Rings for the purposes of CUSA.

Our analysis of whether § 36-471 (2) includes banks within its definitional boundaries is guided by well established principles of statutory construction. "Statu-

---

[19] The relevant language in § 36-471 (2) provides: " 'Agent' shall not include such other persons not within the intent of this subsection as the commissioner may by regulation or order determine. . . ."

The defendants also point to the use of the word "person" in § 36-498 (c) to describe those among whom there shall be contribution in cases of contract, which they claim includes agents. The relevant language of § 36-498 (c) provides: "There shall be contribution as in cases of contract among the several persons so liable." This contention is unpersuasive. Although under some circumstances an agent is liable to *indemnify* his principal for his wrongdoing; see 2 Restatement (Second), Agency § 401 (1958) ("[a]n agent is subject to liability for loss caused to the principal by any breach of duty"); see also id., § 401, comment (d); the defendants point to no authority for an agent's liability to *contribute* to—or share in—his principal's liability for his wrongdoing.

tory construction is a question of law and therefore our review is plenary." *Davis* v. *Norwich*, 232 Conn. 311, 317, 654 A.2d 1221 (1995). "[O]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In seeking to discern that intent, we look to the words of the statute itself, to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter." (Internal quotation marks omitted.) *State* v. *Burns*, 236 Conn. 18, 22–23, 670 A.2d 851 (1996); *State* v. *Spears*, 234 Conn. 78, 86–87, 662 A.2d 80 (1995).

We begin with the definitional language of § 36-471 (2) in its entirety. That language strongly suggests that an "agent" cannot be an artificial person. In addition to the term "agent" being defined in the first sentence of § 36-471 (2) as an "individual," the word "agent" is used in combination with the term "individual" again in the second sentence, which provides that an " '[a]gent' shall not include an individual who . . . ." Moreover, in the last sentence of the definition in § 36-471 (2), the word "agent" is linked to "[a] general partner, officer or director of a broker-dealer or issuer, or a person occupying a similar status or performing similar functions . . . ." These are terms that, in general, refer to natural persons, rather than artificial entities.[20]

Because "agent" is defined as an "individual" and is subsequently used in connection with that term, we

---

[20] It is true that "agent" is used in conjunction with the term "person" in the third sentence; see General Statutes (Rev. to 1993) § 36-471 (2) (" '[a]gent' shall not include such other persons not within the intent of this subsection as the commissioner may by regulation or order determine"); and that the term "person" in legal parlance often includes artificial entities, such as corporations. That slight linguistic indication is insufficient, however, to overcome the more abundant and persuasive evidence that the legislative definition of "agent" is confined to natural persons. This is particularly true because, as we note later in this opinion, another provision of CUSA indicates that "person" and "individual" are not intended to be synonymous.

examine the meaning of the word "individual" to help us understand the boundaries of the definition of "agent." The term "individual" is not defined in CUSA. It is therefore appropriate to look to the common understanding of the term as expressed in the law and in dictionaries. *Doe* v. *Manson*, 183 Conn. 183, 186, 438 A.2d 859 (1981); *Ziperstein* v. *Tax Commissioner*, 178 Conn. 493, 500, 423 A.2d 129 (1979); 2A J. Sutherland, Statutory Construction (5th Ed. Singer 1992) § 47.07, p. 153. "[W]ords and phrases shall be construed according to the commonly approved usage of the language . . . ." General Statutes § 1-1 (a). The common, albeit not exclusive, understanding of the word "individual" does not include artificial entities in its meaning. Given the context of § 36-471 (2), the most appropriate definition of "individual," set forth in Webster's Third New International Dictionary, is "a single human being as contrasted with a social group or institution . . . ." The normal usage of the word "individual," which in turn defines "agent," is consistent with the general understanding we derive from the fourth sentence of § 36-471 (2), namely, that an agent is a natural person and not an artificial entity.

In addition to the common understanding of "individual" as it informs the meaning of "agent" under CUSA, another definition in CUSA indicates the legislature's intent to include only natural persons in the agency liability of § 36-498 (c). "If two or more words are grouped together, it is possible to ascertain the meaning of a particular word by reference to its relationship with other associated words and phrases under the doctrine of noscitur a sociis"; *State* v. *Indrisano*, 228 Conn. 795, 811, 640 A.2d 986 (1994); and "where the same words are used in a statute two or more times they will ordinarily be given the same meaning in each instance. . . . *Weinberg* v. *ARA Vending Co.*, 223 Conn. 336, 343, 612 A.2d 1203 (1992)." (Internal quotation

marks omitted.) *Angelsea Productions, Inc.* v. *Commission on Human Rights & Opportunities*, 236 Conn. 681, 694, 674 A.2d 1300 (1996). The definition of "person" in § 36-471 (10) sheds light on the meaning of the term "individual" because it includes the term "individual" within it. Section 36-471 (10) provides: " 'Person' means an individual, a corporation, a partnership, an association, a joint-stock company, a trust where the interests of the beneficiaries are evidenced by a security, an unincorporated organization, a government or a political subdivision of a government."[21]

For the purposes of this case, the defendants would have us define "individual" as the legislature has defined "person," that is, to include not only natural, but also artificial, persons. Doing so, however, would make the word "individual" in the definition of "person" redundant. The more common sense conclusion is that the legislature intended "individual" to be a subset of the term "person," mutually exclusive of the other terms listed in the definition, and therefore to include within its definitional boundaries only natural persons. This reading is consistent with the language in the statute and the common usage of the term "individual."[22]

We also find guidance in precedent from at least one other state that has adopted these provisions of the

---

[21] This subsection is now codified in substantially similar language at General Statutes § 36b-3 (10).

[22] Other evidence that supports the conclusion that "individual" is a term distinct from "person" is found in Public Acts 1988, No. 88-208, § 1, in which the legislature, among other things, amended CUSA by inserting the word "individual" for the word "person" in the definition of an investment advisor agent. Although not dispositive of the definition of "agent" or "individual," the amendment suggests that the legislature did not intend the terms "person" and "individual" to be interchangeable. While testifying before the joint standing committee on banks, Cynthia Antanaitis, senior administrative attorney for the department of banking, stated: "We would like to change the word person to individual to make this definition consistent with the definition of agent in [§ 36-471 (2)]. Which also refers to the word individual." Conn. Joint Standing Committee Interim Hearings, Banks, 1987 Sess., p. 12.

Uniform Securities Act (Uniform Act), which was drafted in 1956. See, e.g., *Jacobs* v. *Healey Ford-Subaru, Inc.*, 231 Conn. 707, 719, 652 A.2d 496 (1995). In applying Michigan's version of the Uniform Act, the Michigan Court of Appeals interpreted the term "agent" to exclude corporations. "Since an individual and a corporation are treated separately by [the] definition section of the statute, we conclude that the Legislature intended the terms to be mutually exclusive. A corporation, then, cannot be an 'individual.' Because an 'agent' under the statute is limited to an 'individual,' it follows that a corporation cannot be held jointly and severally liable as an agent of a seller of a security under [Mich. Comp. Laws Ann. § 451.810 (b); Mich. Stat. Ann. § 19.776(410) (b)]." *Schpok* v. *Fodale*, 64 Mich. App. 441, 444, 236 N.W.2d 97 (1975). We are aware of no out-of-state authorities to the contrary.

We can identify no other sources that construe this definitional language in a manner that would contradict these very strong linguistic and precedential indicators. There is also nothing in the legislative history to suggest that the language should be given anything other than its generally accepted meaning. We conclude, therefore, that the definition of "agent," as defined in § 36-471 (2), does not include the plaintiff within its purview.

Because the trial court's judgment for the defendants rests on its determination that the plaintiff was the "agent" of Great Rings, our conclusion to the contrary means that, unless there are valid alternate grounds for affirming the trial court's judgment, that judgment must be reversed, and judgment must be rendered for the plaintiff against all the defendants, except for Valerie DePastino, who additionally claims a UCC defense. We discuss next, therefore, the various alternate grounds of affirmance presented by the various defendants.

If "person" and "individual" were synonymous, the definitional statutes would not need a correction for consistency.

## II

The Giacomi defendants and the Santoro defendants claim, pursuant to Practice Book § 4013 (a) (1),[23] three alternate grounds upon which the trial court's judgment should be affirmed: (1) the plaintiff's conduct constituted a violation of § 36-498 (a) (2) of CUSA; (2) the plaintiff was liable as a "person occupying a similar status or performing similar functions" pursuant to § 36-498 (c); and (3) the plaintiff's conduct rendered it a violator of CUSA as a common-law aider and abettor. Santopietro claims as an alternate ground for affirmance that the plaintiff's conduct rendered it a person who directly or indirectly controlled a person liable under subsections (a) and (b) of § 36-498. Undergirding each of these alternate grounds is the premise that the plaintiff's conduct in violation of CUSA thereby affords these defendants valid affirmative defenses under § 36-498 (g). See footnote 6 of this opinion. We agree with the Giacomi defendants and the Santoro defendants that, on the basis of the factual findings in the trial court's first and second memoranda of decision, the plaintiff's conduct, with respect to all the defendants except John and Valerie DePastino and San-

___

[23] Practice Book § 4013 provides in relevant part: "(a) At the time the appellant sends a copy of the endorsed appeal form and the docket sheet to the appellate clerk, the appellant shall also send the appellate clerk an original and one copy of the following:

"(1) A preliminary statement of the issues intended for presentation on appeal. If any appellee wishes to (A) present for review alternate grounds upon which the judgment may be affirmed, (B) present for review adverse rulings or decisions of the court which should be considered on appeal in the event the appellant is awarded a new trial, or (C) claim that a new trial rather than a directed judgment should be ordered if the appellant is successful on the appeal, that appellee shall file a preliminary statement of issues within twenty days from the filing of the appellant's preliminary statement of the issues.

"Whenever the failure to identify an issue in a preliminary statement of issues prejudices an opposing party, the court may refuse to consider such issue. . . ."

topietro, constituted a violation of § 36-498 (a) (2). We disagree with the remaining alternate grounds for affirming the trial court's judgment with respect to John and Valerie DePastino, and with the alternate ground for affirmance presented by Santopietro.

### A

As their initial ground for affirmance, the Giacomi defendants, the Santoro defendants and Santopietro claim that the plaintiff's conduct constituted a violation of § 36-498 (a) (2). Following our remand in *Giacomi*, the Giacomi defendants argued to the trial court that aider and abettor liability has always existed under § 36-498 (a) (2), as evidenced by what they claimed to be a clarifying amendment to that section by Public Acts 1993, No. 93-169, § 1 (P.A. 93-169).[24] In a brief to the trial court prior to its first decision, Santopietro argued that § 36-498 (a), as amended by P.A. 93-169, § 1, applied to the plaintiff. Moreover, in their brief to this court, the Santoro defendants argue that the plaintiff can be held primarily liable under § 36-498 (a) pursuant to *Pinter* v. *Dahl*, 486 U.S. 622, 647, 108 S. Ct. 2063, 100 L. Ed. 2d 658 (1988), in which the United States Supreme Court interpreted § 12 (1) of the Securities Act of 1933, the federal analog to § 36-498 (a), to extend liability

---

[24] Public Act 93-169, § 1, which amended General Statutes (Rev. to 1993) § 36-498 (a) (2), provides in relevant part: "Any person who . . . (2) offers or sells OR MATERIALLY ASSISTS ANY PERSON WHO OFFERS OR SELLS a security by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, WHO KNEW OR IN THE EXERCISE OF REASONABLE CARE SHOULD HAVE KNOWN OF THE UNTRUTH OR OMISSION, the buyer not knowing of the untruth or omission, and who does not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the untruth or omission, is liable to the person buying the security . . . ."

The Giacomi defendants also claimed, with respect to P.A. 93-169, that the legislature intended the amendment to § 36-498 (a) (2) to apply retroactively and that such a retroactive application would not be unconstitutional.

to a person who "successfully solicits the purchase, motivated at least in part by a desire to serve his own financial interests or those of the securities owner." In what we assume to be an alternate argument under § 36-498 (a), the Santoro defendants also seek to have us apply the "substantial factor" test to determine the primary liability of the plaintiff under § 36-498 (a).[25]

Although these defendants argued that the plaintiff's conduct violated § 36-498 (a), the trial court's memorandum of decision on remand makes no mention of *Pinter* or the "substantial factor" argument, and refers to P.A. 93-169 only in passing.[26] "Our rules of practice require that the trial court state its decision on each issue in the case and its conclusion as to each claim of law raised by the parties. Practice Book § 4059." *McLaughlin* v. *Bronson*, 206 Conn. 267, 277, 537 A.2d 1004 (1988). Despite the defendants' failure to request an articulation pursuant to Practice Book § 4051; see *Pandolphe's Auto Parts, Inc.* v. *Manchester*, 181 Conn. 217, 222 n.5, 435 A.2d 24 (1980); we nonetheless conclude that consideration of the claim is appropriate in the present case under the plain error doctrine.

---

[25] The "substantial factor" test, which includes as a seller one "whose participation in the buy-sell transaction is a substantial factor in causing the transaction to take place"; *Pharo* v. *Smith*, 621 F.2d 656, 667 (5th Cir. 1980); was rejected by the United States Supreme Court in *Pinter* v. *Dahl*, supra, 486 U.S. 651, because it "divorces the analysis of seller status from any reference to the applicable statutory language and from any examination of § 12 [of the federal Securities Act of 1933] in the context of the total statutory scheme." The Santoro defendants, however, cite *Hoffer* v. *State*, 113 Wash. 148, 152, 776 P.2d 963 (1989) ("we retain the 'substantial contributive factor' test in interpreting the term 'seller' in [Wash. Rev. Code § 21.20.430 (1)]"), in support of their claim that some states have continued to use the substantial factor test when interpreting their version of this model code provision.

[26] When it mentioned P.A. 93-169, the trial court was considering the defenses of only Santopietro and John DePastino, both of whom did not testify at trial. Because the defendants had not established that they had no knowledge of the alleged untruths or omissions—a requirement unchanged by P.A. 93-169—the trial court did not consider the effect of that amendment on § 36-498 (a).

It is plain error for the trial court to fail to apply an applicable statute. *Genovese* v. *Gallo Wine Merchants, Inc.*, 226 Conn. 475, 480 n.6, 628 A.2d 946 (1993); *Ralto Developers, Inc.* v. *Environmental Impact Commission*, 220 Conn. 54, 59, 594 A.2d 981 (1991). Plain error adjudication is warranted in this case because: (1) the applicability of § 36-498 (a) (2) was distinctly raised before the trial court by the defendants and by this court on remand; (2) no party was prejudiced in that the interpretation of the statute and the resolution of this issue does not require further fact-finding; and (3) all parties had an opportunity to present arguments on this issue in their supplementary briefs that we ordered to be filed in this court following oral argument.[27]

We first address the defendants' contention that P.A. 93-169, § 1, which included language to make those persons liable who materially assist a primary violator of § 36-498 (a) (2), was clarifying, and therefore has retroactive application. "We presume that, in enacting a statute, the legislature intended a change in existing law. . . . This presumption, like any other, may be rebutted by contrary evidence of the legislative intent in the particular case. An amendment which in effect construes and clarifies a prior statute must be accepted as the legislative declaration of the meaning of the original act. . . . *Kluttz* v. *Howard*, 228 Conn. 401, 409, 636 A.2d 816 (1994); see also *Shelton* v. *Commissioner of Environmental Protection*, 193 Conn. 506, 513–14, 479

---

[27] We requested that the parties submit supplementary simultaneous briefs on the following issues: "(1) When the legislature amended General Statutes (Rev. to 1993) § 36-498 (a) (2) by enacting Sec. 1 of 1993 Public Acts No. 93-169, was the legislation intended to clarify the existing legislative intent and, therefore, to have retroactive effect; see, e.g., *State* v. *Magnano*, 204 Conn. 259, 277–84, 528 A.2d 760 (1987); or was the legislation intended to have prospective effect only from the effective date of the legislation?

"(2) If the answer to question (1) is that the legislation was intended to have retroactive effect, do the facts found by the trial court support an affirmative defense under § 36-498 (a) (2) as a matter of law?"

A.2d 208 (1984). An amendment that is intended to clarify the original intent of an earlier statute necessarily has retroactive effect. *State* v. *Magnano*, 204 Conn. 259, 284, 528 A.2d 760 (1987); see also *Circle Lanes of Fairfield, Inc.* v. *Fay*, 195 Conn. 534, 540, 489 A.2d 363 (1985). To determine whether an act should be characterized as clarifying legislation, we look to the legislative history to determine the legislative intent. . . . *Reliance Ins. Co.* v. *American Casualty Ins. Co. of Reading, Pennsylvania*, 238 Conn. 285, 290, 679 A.2d 925 (1996)." (Internal quotation marks omitted.) *State* v. *State Employees' Review Board*, 239 Conn. 638, 648–49, 687 A.2d 134 (1997).

We conclude, on the basis of the legislative history of P.A. 93-169, § 1, that the intent of the legislature was to clarify the existence of aiding and abetting liability under § 36-498 (a) (2), and thus to render its terms retroactive. That intent was expressed in the following colloquy between Representative Robert Farr and Representative Richard D. Tulisano:

"Representative Farr: Through you, Madam Speaker, to Representative Tulisano. So someone who materially assisted prior to the adoption of this act would not be liable to the effect of the act, but now will be? Through you, Madam Speaker to Representative Tulisano.

"Deputy Speaker [Moira] Lyons: Representative Tulisano.

"Representative Tulisano: Through you, Madam Speaker. It is clear now they would be. I'm not sure how material assistance was interpreted prior to this, to be honest with you. I would have brought a claim against them anyway if they were materially involved, frankly, and thought they would come under it, this makes it clear. But I can't tell you that was absolute before.

"Deputy Speaker Lyons: Representative Farr.

"Representative Farr: Well, through you, Madam Speaker, to Representative Tulisano, for legislative intent, is it the intent to change the law retroactively so that it affects the conduct, it will affect the conduct of someone under the new language, or is it the intent to clarify what you believe to be existing language. Through you, Madam Speaker, to Representative Tulisano.

"Deputy Speaker Lyons: Representative Tulisano.

"Representative Tulisano: Yes, Madam Speaker. Thank you, Mr. Farr. *It is not to change the law, but to clarify what I would consider the law because they're a participant anyway. It's not saying something different.*" (Emphasis added.) 36 H.R. Proc., Pt. 17, 1993 Sess., pp. 6091–93. Additionally, later in the floor discussion, Representative Tulisano further explained the scope of the amending language in question: "[A]s I indicated to Representative Farr, it is in fact, clarifying what the current language is . . . ." Id., p. 6102.[28]

Our conclusion that the legislature intended the amendment to § 39-498 (a) (2) to clarify the meaning of the statute is buttressed by the fact that an additional amendment to § 36-498 effected by P.A. 93-169, § 1,

---

[28] The plaintiff argues that the legislative history on this point is equivocal, and as such, should not overcome the presumption in favor of a prospective application. As support for its position, the plaintiff points to earlier floor comments made by Representative Farr and Representative Michael P. Lawlor that indicate a fear that the amendment would create new burdens. See 36 H.R. Proc., supra, pp. 5180–83. Five days later, however, Representative Farr engaged in the colloquy with Representative Tulisano quoted previously, which clearly indicates that the legislature's intent was to clarify the law. Because the colloquy between Representative Farr and Representative Tulisano followed the floor comments cited by the plaintiff, and because Representative Farr, who initially characterized the amendment as changing the law, participated in this later colloquy indicating *clarifying* intent, we conclude that the latter colloquy is the more persuasive of the two.

namely, that which amended the statute of limitations set forth in § 36-498 (f), which was the main focus of the legislative debate, extended that statute of limitations under CUSA for actions arising out of intentional misrepresentation or fraud from two years from the date of the contract to one year from the discovery of the fraud or five years from the date of the fraud.[29] As the legislative debate on that provision indicates, the legislature was plainly aware that such an extension of the statute of limitations necessarily had a retroactive effect, namely, removing a bar to suit that had been in place with respect to conduct that took place outside the period of the earlier statute of limitations. Thus, when P.A. 93-169, § 1, amended § 36-498 (a) (2), it was done in connection with another provision of that stat-

---

[29] Public Act 93-169, § 1, which amended General Statutes (Rev. to 1993) § 36-498 (f), provides in relevant part: "(f) No person may BRING AN ACTION under this section more than two years after the date of the contract of sale or of the contract for investment advisory services, EXCEPT THAT (1) WITH RESPECT TO ACTIONS ARISING OUT OF INTENTIONAL MISREP-RESENTATION OR FRAUD IN THE PURCHASE OR SALE OF ANY INTER-EST IN ANY LIMITED PARTNERSHIP NOT REQUIRED TO BE REGISTERED UNDER THE SECURITIES ACT OF 1933, NO PERSON MAY BRING AN ACTION MORE THAN ONE YEAR FROM THE DATE WHEN THE MISREPRESENTATION OR FRAUD IS DISCOVERED, EXCEPT THAT NO SUCH ACTION MAY BE BROUGHT MORE THAN FIVE YEARS FROM THE DATE OF SUCH MISREPRESENTATION OR FRAUD PROVIDED, WITH RESPECT TO AN ACTION PENDING ON THE EFFECTIVE DATE OF THIS ACT, THAT ASSERTS FACTS UPON WHICH A CLAIM COULD BE ASSERTED UNDER THIS SECTION ON AND AFTER THE EFFECTIVE DATE OF THIS ACT, AND WHICH CLAIM IS ASSERTED PRIOR TO JANU-ARY 1, 1994, NO SUCH ACTION MAY BE BROUGHT FOR INTENTIONAL MISREPRESENTATION OR FRAUD THAT OCCURRED MORE THAN FIVE YEARS PRIOR TO THE DATE OF THE FILING OF THE COMPLAINT IN SUCH ACTION, AND (2) WITH RESPECT TO ACTIONS ARISING OUT OF INTENTIONAL MISREPRESENTATION OR FRAUD IN THE PURCHASE OR SALE OF SECURITIES OTHER THAN SECURITIES DESCRIBED IN SUBDIVISION (1) OF THIS SUBSECTION, NO PERSON MAY BRING AN ACTION MORE THAN ONE YEAR FROM THE DATE WHEN THE MISREP-RESENTATION OR FRAUD IS DISCOVERED OR IN THE EXERCISE OF REASONABLE CARE SHOULD HAVE BEEN DISCOVERED, EXCEPT THAT NO SUCH ACTION MAY BE BROUGHT MORE THAN THREE YEARS FROM THE DATE OF SUCH MISREPRESENTATION OR FRAUD. . . ."

ute that also had retroactive effect, albeit through a different legislative vehicle.

We conclude, therefore, that P.A. 93-169, § 1, was meant to clarify § 36-498 (a) (2). Because we conclude that P.A. 93-169, § 1, was a clarifying amendment, it "must be accepted as the legislative declaration of the meaning of the original act." (Internal quotation marks omitted.) *Kluttz* v. *Howard*, supra, 228 Conn. 409. Accordingly, we conclude that § 36-498 (a) (2) encompassed aiding and abetting liability within its parameters at the time of the underlying actions in the case before us.

The plaintiff argues that, if we conclude that P.A. 93-169, § 1, which amends § 36-498 (a) (2), is clarifying, the retroactive effect of the amendment violates: (1) its right to due process of law guaranteed by the fourteenth amendment of the United States constitution[30] because it creates new substantive liability; (2) its right to equal protection as guaranteed by the fourteenth amendment of the United States constitution; see footnote 30; and the constitution of Connecticut, article first, § 20, as amended by articles five and twenty-one of the amendments,[31] by creating classifications unrelated to a legitimate state interest; and (3) the Connecticut constitution's separation of powers doctrine[32] by

___

[30] The fourteenth amendment to the United States constitution provides in relevant part: "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

[31] The constitution of Connecticut, article first, § 20, as amended by articles five and twenty-one of the amendments, provides: "No person shall be denied the equal protection of the law nor be subjected to segregation or discrimination in the exercise or enjoyment of his or her civil or political rights because of religion, race, color, ancestry, national origin, sex or physical or mental disability."

[32] The constitution of Connecticut, article second, provides: "The powers of government shall be divided into three distinct departments, and each

attempting to vary the outcome of pending cases. We are unpersuaded by the plaintiff's constitutional claims.

Initially, we note that a party challenging the constitutionality of a statute must prove its unconstitutionality beyond a reasonable doubt. *Connecticut Building Wrecking Co.* v. *Carothers*, 218 Conn. 580, 590, 590 A.2d 447 (1991); *Zapata* v. *Burns*, 207 Conn. 496, 508, 542 A.2d 700 (1988). Every presumption is to be given in favor of the constitutionality of a statute. *State* v. *Floyd*, 217 Conn. 73, 79, 584 A.2d 1157 (1991); *Bottone* v. *Westport*, 209 Conn. 652, 657, 553 A.2d 576 (1989).

The plaintiff's due process claim fails because, by definition, the amendment did *not* create a new substantive liability. Rather, it simply made explicit the liability that had existed implicitly in § 36-498 (a) (2) from the date of its enactment. The necessarily retroactive effect of clarifying legislation is not to be confused with the retroactive effect of legislation that changes the law. The former clarifies the substantive provisions to which a person has always been subject. The latter applies substantive provisions to a person heretofore not subject to those provisions. A claim that a clarifying amendment has created new substantive liability, therefore, is inapposite. See *State* v. *Blasko*, 202 Conn. 541, 559–60, 522 A.2d 753 (1987).[33]

The plaintiff's equal protection claim fails due to its inadequate briefing. We are not required to review

of them confided to a separate magistracy, to wit, those which are legislative, to one; those which are executive, to another; and those which are judicial, to another."

[33] We acknowledge that the principle of legislative "clarification" of intent has limits. Thus, the legislature could not attempt to clothe a retroactive substantive change in clarifying garb by, for example, attempting to "clarify" the meaning of a statute to mean something different from a court's repeated and consistent interpretation of the same statute. This is not, however, such a case.

issues that have been improperly presented to this court through an inadequate brief. *State* v. *Tweedy*, 219 Conn. 489, 510 n.17, 594 A.2d 906 (1991). Although the plaintiff claims that the amendment created classifications unrelated to a legitimate state interest, it did not specify what classifications it thought the amendment created, nor did it discuss the rationality of such classifications. We decline to address such a broad and undeveloped claim.

The plaintiff's last claim for the unconstitutionality of P.A. 93-169 focuses on the alleged incompatibility of the amendment with the separation of powers provision of article second of the Connecticut constitution. The plaintiff argues that under the separation of powers doctrine, it is not within the legislature's power to affect pending cases. We have often held, however, that it is as much within the legislative power as the judicial power—subject, of course, to constitutional limits other than the separation of powers—for the legislature to declare what its intent was in enacting previous legislation. See *State* v. *Magnano*, supra, 204 Conn. 284 ("[e]ven though the legislative clarification was prompted by a judicial decision that the legislature deemed mistaken, such a clarification does not constitute an invasion of judicial authority"); see generally *State* v. *One 1977 Buick Automobile*, 196 Conn. 471, 479, 493 A.2d 874 (1985); *Circle Lanes of Fairfield, Inc.* v. *Fay*, supra, 195 Conn. 540; *Neyland* v. *Board of Education*, 195 Conn. 174, 180, 487 A.2d 181 (1985); *Shelton* v. *Commissioner of Environmental Protection*, supra, 193 Conn. 514–15; *Lee* v. *Board of Education*, 181 Conn. 69, 75, 434 A.2d 333 (1980), on appeal after remand sub nom. *Halpern* v. *Board of Education*, 231 Conn. 308, 649 A.2d 534 (1994); *Tax Commissioner* v. *Estate of Bissell*, 173 Conn. 232, 246, 377 A.2d 305 (1977); 1A J. Sutherland, Statutory Construction (4th Ed. Sands 1984) §§ 22.31 and 22.35. Implicit in those

holdings was the recognition that pending cases could be affected thereby. See, e.g., *State* v. *Magnano*, supra, 278–84. The plaintiff's claim of unconstitutionality based on the separation of powers, therefore, fails.

Having decided that P.A. 93-169, § 1, clarified § 36-498 (a) (2), and that, therefore, the language should be applied retroactively, we now set out the specific elements that must be met in order for conduct to constitute a violation of the "materially assists" portion of P.A. 93-169, § 1. Public Act 93-169, § 1, provides in relevant part: "(a) Any person who . . . (2) offers or sells *or materially assists any person who offers or sells* a security by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, *who knew or in the exercise of reasonable care should have known of the untruth or omission,* the buyer not knowing of the untruth or omission, and who does not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the untruth or omission, is liable to the person buying the security . . . ." (Emphasis added.)

First, there must be a primary violator. To establish the liability of the primary violator, the buyer must prove: (1) that the primary violator offered or sold a security by means of either an untrue statement of a material fact, or an omission to state a material fact necessary to make any statements made, in the circumstances of their making, not misleading; and (2) that the buyer did not know of the untruth or omission. The primary violator, however, has a defense to such an action if it meets its burden of persuading the fact finder that it did not know, and in the exercise of reasonable care could not have known, of the untruth or omission.

In order for conduct to violate this section as "material assistance," to which we refer as aiding and abetting, it must also be proven that the aider or abettor materially assisted the primary violator: (1) in the offer or sale; and (2) in the violation by which the primary violator accomplished the offer or sale. In addition to the foregoing elements of proof, the buyer must also meet a burden of production concerning the issue of whether the aider and abettor knew or should have known of the untruth or omission. If the buyer meets this burden of production, the burden of proof on this issue shifts, so that the aider and abettor then bears the burden of persuading the fact finder that it did not know, and in the exercise of reasonable care could not have known, of the untruth or omission.[34]

---

[34] Our reading of the allocation of the burdens of production and persuasion with respect to the issue of the aider and abettor's knowledge of the untruth or omission is based on the language in § 36-498 (a) (2) and the legislative history of P.A. 93-169.

Section 410 (a) (2) of the Uniform Act, upon which § 39-498 (a) (2) is based, provides in relevant part: "Any person who . . . offers or sells a security by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading (the buyer not knowing of the untruth or omission), and who does not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the untruth or omission, is liable to the person buying the security from him . . . ." This language clearly places on the seller the burden of proving that he did not know, nor could have known, of the untruth or omission. Public Act 93-169, however, added not only the "materially assists" language, but also an additional statement regarding the aider and abettor's knowledge of the untruth or omission. See footnote 24 of this opinion.

The statute as it currently reads, therefore, presents an inherent contradiction. The language that was added regarding the aider and abettor's knowledge of the untruth or omission would seem to place the burden of proof of that issue on the buyer as part of his prima facie case. The language concerning the aider and abettor's knowledge, which had already existed in the statute, however, squarely places the burden of proof of that issue on the alleged aider and abettor. It would be contradictory to say that both the buyer and the alleged aider and abettor bear the burden of proof on the same issue. We, therefore, see only two possible readings of the statute that will resolve this contradiction.

We now turn to each of the defendants in order to determine whether the factual findings made by the trial court in its first and second memoranda of decision require, as a matter of law, the conclusion that, with respect to that defendant, the plaintiff's conduct constituted a violation of § 36-498 (a) (2). We conclude that, on the basis of the trial court's findings, John and Valerie DePastino and Santopietro, did not establish that the plaintiff's conduct violated § 36-498 (a) (2), but that Robert Giacomi, Jack Giacomi, Joseph and Hope Santoro and Rosa did establish that the plaintiff's conduct violated § 36-498 (a) (2).

First, we could interpret the added language as superfluous, and read the statute to place the entire burden of proof of the aider and abettor's knowledge on the aider and abettor. Second, we could read the added language to shift the burden of production on that issue to the buyer. We adopt the second alternative for two reasons.

If we were, literally, to read out of the statute the language specifically enacted by the legislature, such a reading would be in direct contradiction to the well known canon of construction that "[a] statute should be construed so that no word in it is treated as superfluous or insignificant. *Kulis* v. *Moll*, 172 Conn. 104, 111, 374 A.2d 133 (1976)." *State* v. *Roque*, 190 Conn. 143, 150-51, 460 A.2d 26 (1983). If we were to adopt the first alternative, we would render an entire *clause* superfluous.

Second, we find support for the burden shifting interpretation in the legislative history. On the Senate floor, Senator Winthrop Smith, Jr., expressed concern about the "material assistance" language and the number of people that might be included under the language. Specifically, he was worried about their getting drawn into a large lawsuit. Senator Smith stated: "Maybe they can get out, but they're going to have to fight their way out of the litigation and that can be very expensive." 36 S. Proc., Pt. 9, 1993 Sess., p. 3308. Very soon after this comment, Senator William H. Nickerson stated that the added language was meant to qualify the "material assistance" language, i.e., to clarify that an aider and abettor must also have the requisite knowledge to be liable under this section. Id., p. 3311.

We take this combination of statements to express a desire on the part of the legislature to provide some additional protection for those persons alleged to be aider and abettors, namely, that the plaintiff will have to produce some evidence relevant to the aider and abettor's knowledge of the untruth or omission before that issue gets to the fact finder. A simple pleading of knowledge will not suffice. We conclude, therefore, that on the issue of an aider and abettor's knowledge of the untruth or omission, the buyer bears the burden of production, and the aider and abettor bears the ultimate burden of persuasion.

### 1

Because John DePastino and Santopietro did not testify at trial, the trial court concluded that they had not carried their burdens of proof that they did not know of the untruth or omission of a material fact. Thus, as to them, there was insufficient proof of a primary violation. Because proof of a primary violation is necessary to prove an aiding and abetting violation, their claims of aiding and abetting liability necessarily fail. With respect to Valerie DePastino, the trial court concluded that she was not a "buyer" within the meaning of § 36-498 (a) (2), and must therefore rely on her husband's state of mind because he bought the share "for her." As previously mentioned, however, John DePastino did not testify and, therefore, did not carry his burden of proof as to his mental state. The trial court thus concluded that Valerie DePastino also had not carried her burden of proof regarding this element. Accordingly, with respect to John and Valerie DePastino and Santopietro, this first alternate ground for affirmance must fail.[35]

### 2

The first element that must be found for a § 36-498 (a) (2) primary violation is that a person "offers or sells a security by means of any untrue statement of a material fact . . . ." With respect to Robert Giacomi, Jack Giacomi, Joseph and Hope Santoro and Rosa, this

---

[35] We conclude that the entire first alternate ground for affirming the trial court's judgment must fail with respect to John and Valerie DePastino, including the arguments under *Pinter* v. *Dahl*, supra, 486 U.S. 622, and the "substantial factor" test, because when the legislature amended § 36-498 (a) (2), it clarified the scope of aider and abettor liability under this section. We have no need, therefore, to look at the federal counterpart to § 36-498 (a) (2) and the theories of aider and abettor liability that have developed under it to determine the reach of our statute. Public Act 93-169, § 1, has preempted those theories of accessory or secondary liability.

element has been established by the findings of the trial court.

In its second memorandum of decision, the trial court explicitly stated: "For reasons stated at length in [the trial court's first memorandum of decision] . . . [t]he Great Rings developers sold the securities in question by means of numerous untrue statements of material facts and omitted to state numerous other material facts necessary in order to make the statements that they did make not misleading." In its first memorandum of decision, the trial court stated: "In selling Great Rings in Waterbury there is ample evidence that all four promoters *consistently misled the investors by giving them optimistic forecasts of the money that would be realized on their investment* and by utterly failing to inform them of the manifold risks associated with the venture."[36] (Emphasis added.) We conclude that the trial court's factual findings adequately support its legal conclusion that Great Rings sold the securities in question by means of numerous untrue statements of material facts.[37]

---

[36] The trial court also related the specific facts surrounding Great Rings' promotion of the investment scheme to each of these five defendants.

[37] The plaintiff argues that in order for us to affirm the trial court's judgment under § 36-498 (a) (2), the trial court must have found that the defendants, each in his or her own right, relied on the untrue statement of material fact in their decision to purchase the Great Rings shares.

Section 36-498 (a) (2) of CUSA is based upon § 410 (a) (2) of the Uniform Act, which, according to the comments to that section, is almost identical to § 12 (2) of the federal Securities Act of 1933. 15 U.S.C. § 77*l* (2) (1988) ("[a]ny person who . . . offers or sells a security . . . by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission, shall be liable to the person purchasing such security from him").

Section 12 (2) of the federal Securities Act of 1933, however, has been interpreted by the United States Court of Appeals for the Second Circuit

The next element that must be found before a person may be held liable under § 36-498 (a) (2) is that the buyer of the securities must not know of the untruth or omission complained of. The trial court made specific factual findings with respect to each defendant concerning this element, and concluded that Robert Giacomi, Jack Giacomi, Joseph and Hope Santoro and Rosa had sustained their burdens of proof on this issue.

Having concluded that, with respect to these defendants, the facts found by the trial court establish a prima facie case for a primary violation by Great Rings, we now address whether the facts show, as a matter of law, that the *plaintiff* has sustained *its* burden of proving that Great Rings did not know, and could not have known, of the untrue statement of material fact. If the facts found meet this burden as a matter of law, there would be a valid defense to the claimed statutory violation by Great Rings, the primary violator, and therefore, to the claimed aider and abettor violation by the plaintiff. After a thorough review of both memoranda of decision of the trial court, however, we cannot say, as a matter of law, that the plaintiff has sustained its burden on this issue. Indeed, the trial court, throughout its memoranda of decision, strongly suggested that the untrue statements made by Great Rings were intentional.[38] We conclude, therefore, that under the facts

as not requiring a finding that the buyer relied on the untrue statement of material fact. The Court of Appeals determined that "[r]eliance by the buyer need not be shown, for § 12 (2) 'is a broad anti-fraud measure and imposes liability whether or not the purchaser actually relied on the misstatement.' *Akerman* v. *Oryx Communications, Inc.*, 810 F.2d 336, 344 (2d Cir. 1987). This section requires only 'some' causal connection between the alleged communication and the sale, 'even if not "decisive." ' *Jackson* v. *Oppenheim,* 533 F.2d [826, 830 n.8 (2d Cir. 1976)]." *Metromedia Co.* v. *Fugazy,* 983 F.2d 350, 361 (2d Cir. 1992), cert. denied, 508 U.S. 952, 113 S. Ct. 2445, 124 L. Ed. 2d 662 (1993). We agree with and adopt the reasoning of the Second Circuit Court of Appeals, in concluding that reliance is not a required element in an action under § 36-498 (a) (2).

[38] In many of its factual findings, the trial court indicated the intent with which Great Rings acted. Those factual findings provided in part as follows:

found by the trial court, the remaining defendants have established a primary violation by Great Rings of § 36-498 (a) (2). We now turn to the aider and abettor elements in § 36-498 (a) (2).

The first element that must be found in an alleged § 36-498 (a) (2) violation, in addition to those required for a primary violation, is that the aider and abettor must materially assist the primary violator in the offer or sale of the securities and in the violation by which the primary violator accomplished the offer or sale, which in this case is the selling of a security by means of an untrue statement of material fact. The trial court quoted *Kungys* v. *United States*, 485 U.S. 759, 770, 108 S. Ct. 1537, 99 L. Ed. 2d 839 (1988), for the proposition that "aid is 'material if it "has a natural tendency to influence, or was capable of influencing, the decision

---

"The promoters here were, essentially, common criminals, who engaged in numerous acts of fraud, forgery and, in all likelihood, outright theft of the invested funds. . . .

"Zak and the general partners then agreed upon a new method of financing. . . . It is clear that [the financing] scheme, while not inherently unlawful, contained a substantial Ponzi element from the very beginning. . . . This aspect of the enterprise was utterly unmentioned in any of the promotional literature or legal filings produced by Great Rings and in the sales pitches given by the Great Rings promoters. . . .

"The evidence is clear that [Kenneth Zak and his brother William Zak] didn't care a whit about the accredited investor rule supposedly governing investor eligibility. . . . The evidence is overwhelming that the Zaks . . . solved [the accredited investor] problem by the simple expedient of wholesale forgery. . . .

"[A]ll four promoters *consistently misled* the investors by giving them optimistic forecasts of the money that would be realized on their investment and by utterly failing to inform them of the manifold risks associated with the venture. . . .

"[T]he general atmosphere of fraud and betrayal in this case, the fact that no satisfactory accounting of funds has ever been made, and [a general partner's] acquisition and transfer of Parcel 3 in March, 1989, in a transaction obviously designed to benefit himself rather than the investors, all irresistibly lead to the conclusion that in whole or in part the investors' money was simply stolen." (Emphasis added.)

Implicit in these statements is the trial court's determination that Great Rings acted intentionally to defraud the investors.

of" ' the purchaser." In addition, this standard is consistent with a recent interpretation by the United States Court of Appeals for the Second Circuit of § 12 (2) of the federal Securities Act of 1933, upon which § 36-498 (a) (2) of CUSA is based. See footnote 37 of this opinion. In *Metromedia Co.* v. *Fugazy*, 983 F.2d 350, 361 (2d Cir. 1992), cert. denied, 508 U.S. 952, 113 S. Ct. 2445, 124 L. Ed. 2d 662 (1993), the Court of Appeals stated that, in order for a statement to contribute to a § 12 (2) violation, the "statement itself need not be considered in isolation rather than in the context of the total presentation. A seemingly innocuous oral communication not containing affirmative misrepresentations may violate § 12 (2) if it is used to emphasize, or induce reliance on, some other representation that is false or misleading." We conclude that these formulations accurately describe the concept of material assistance in this context, and we turn to the factual record regarding the Giacomis, the Santoros and Rosa.

We note initially that, in the alternate section of its second memorandum of decision, the trial court specifically found, in conclusive fashion, that the plaintiff had materially aided Great Rings' fraudulent conduct in violation of the statute. In discussing the plaintiff's liability as an "agent" pursuant to Great Rings' primary violation of § 36-498 (a) (2), the trial court stated that "[the plaintiff] materially aided in the fraudulent acts or transactions constituting the violation." The trial court's more specific factual findings in its first memorandum of decision support this statement.

With respect to Joseph and Hope Santoro, the factual findings of the trial court support the determination that the plaintiff materially aided in the violation by which the primary violator, Great Rings, had accomplished the sale.[39] When Joseph Santoro went to the

---

[39] With respect to Joseph and Hope Santoro, the trial court found that "[e]ven though Hope herself never had any contact with the promoters, it

plaintiff to apply for the loan, he did not meet with Truelove, but with "Freddie," Truelove's assistant. The trial court found that "Freddie said that Truelove was aware of all that was going on and that all that was needed was his signature. This led Santoro to believe that Zak was true to his word. He couldn't imagine . . . walking into a bank, not meeting a loan officer, and walking out with $50,000 apiece." Joseph Santoro took the note with him, and mailed it back to the plaintiff at a later date. We conclude that these actions by the plaintiff constitute material assistance in the untruth as a matter of law. The trial court found that it was the plaintiff's actions—the statement by Freddie that Truelove was aware of what was going on and the ease with which the loan was granted—that led Joseph Santoro to believe that Zak was true to his word, i.e., that Zak had made no untrue statements of material fact. The plaintiff's actions in lending the money authenticated and induced reliance on Great Rings' untrue statements of material fact. Thus, the plaintiff's actions had a natural tendency to influence the decision of Joseph Santoro, and through him, Hope Santoro, and therefore, materially aided the primary violator. The plaintiff's representation in this encounter emphasized, and helped to procure reliance on, Zak's previous misrepresentation.

With respect to Rosa, the facts even more clearly support the conclusion that the plaintiff materially aided in Great Rings' untrue statements of material fact. The trial court found that "Rosa went to [the plaintiff] and was brought into Truelove's office. Truelove, who Rosa had never met, gave Rosa the note to sign. Rosa said that *he was confident in the investment because the [plaintiff] had fully endorsed it. Truelove did not*

is clear that Joseph acted as her agent, and any fraud on him necessarily acted as a fraud on her." The plaintiff has not challenged this finding of the trial court.

*deny this.* Rather, Truelove simply put the signed note away. To Rosa, this was, for all practical purposes, an endorsement." (Emphasis added.) As was the case with Joseph Santoro, the plaintiff's actions endorsed the untrue statements made by Great Rings and clearly had a tendency to influence the decision of Rosa. The trial court's findings support the conclusion that the plaintiff had materially aided in Great Rings' violation of § 36-498 (a) (2) with respect to Rosa.

With respect to Robert Giacomi, the plaintiff's actions also fall within the "material assistance" requirements. The trial court found that "[w]hen [Robert Giacomi] called Truelove on the telephone, Truelove said that he was very familiar with Great Rings. A meeting was set up for the next day. At the meeting, Truelove said that he had gone out to see the land in question, which he characterized as one of the most beautiful pieces of land in Connecticut. Truelove said that he was thinking of purchasing one of the lots, that *Great Rings couldn't miss and that it was a 'homerun.'*" (Emphasis added.) This can only be seen as a ringing endorsement of the Great Rings venture, particularly of the sizeable returns promoted by Great Rings. The trial court's factual findings support the conclusion that the plaintiff had materially aided in Great Rings' violation of § 36-498 (a) (2) with respect to Robert Giacomi.

With respect to Jack Giacomi, the endorsement of the Great Rings venture by the plaintiff is also evident in the trial court's factual findings. The trial court found that when he was talking to Jack Giacomi, "Truelove said of Kenneth Zak, 'this guy's been doing this for a long time. He's a pro. *This is a pretty good project, and everyone should make some money.'*" This endorsement materially aided in Great Rings' untrue statements of the value of the Great Rings investment. We conclude, therefore, that the trial court's findings support the conclusion that the plaintiff materially aided in Great Rings'

violation of § 36-498 (a) (2) with respect to Jack Giacomi.

We next determine whether the findings in the trial court's memoranda of decision support the conclusion that the defendants sustained their burdens of production concerning the issue of whether the aider and abettor knew or should have known of the untruth or omission. If the defendants presented evidence to establish facts from which a fact finder could have concluded that the plaintiff knew or should have known of the primary violation, the defendants would have met their burdens of production. *Furstein* v. *Hill*, 218 Conn. 610, 625, 590 A.2d 939 (1991). In its first memorandum of decision, the trial court discussed the plaintiff's level of knowledge with respect to Great Rings' primary violation of CUSA stating: "The banking activity *established by the evidence in this case*, however, cannot by even the most generous stretch of the imagination be described as normal everyday business practices. Rather, the banking practices here were atypical in the extreme. No one who has ever dealt with a bank in any loan transaction whatsoever can review the catalogue of [the plaintiff's] acts in this case without shaking his head in wonder. This obvious fact must plainly be considered in determining the level of scienter necessary to find aiding and abetting liability here.

"At a minimum, *the evidence firmly establishes* recklessness on [the plaintiff's] part. Its behavior was, either by its own written standards or any other standard, 'highly unreasonable . . . involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and *which presents a danger of misleading buyers . . . that is either known to the [plaintiff] or is so obvious that the actor must have been aware of it.*'" (Emphasis added.) These findings by the trial court firmly establish that the defendants met their burdens of production

on the issue of the plaintiff's actual or constructive knowledge of the untrue statement of a material fact.

The record requires the conclusion, therefore, that these five defendants—Robert Giacomi, Jack Giacomi, Joseph and Hope Santoro and Rosa—established a prima facie case of aiding and abetting liability under § 36-498 (a) (2). Under that section, however, the plaintiff can avoid liability if it can sustain its burden of persuasion that it did not know, and in the exercise of reasonable care could not have known, of the untruth or omission that constituted the violation of the securities law. The trial court found under its alternate conclusions, however, that the plaintiff had not sustained its burden of proving that it did not know, and in the exercise of reasonable care could not have known, of the untruth or omission. Thus, the exculpatory clause of § 36-498 (a) (2) can offer no defense to the plaintiff.[40]

Having determined that Robert Giacomi, Jack Giacomi, Joseph and Hope Santoro and Rosa have established, as a matter of law, that the plaintiff's conduct, with respect to them, constituted a violation of § 36-498 (a) (2), we turn to the remaining alternate arguments put forward by the remaining defendants.

## B

John DePastino claims, as briefed by the Santoro defendants, that the plaintiff is liable as a person "occu-

[10] The language in § 36-498 (a) (2) sets forth a negligence standard for the plaintiff—"in the exercise of reasonable care could not have known, of the untruth, or omission . . . ." In the trial court's first memorandum of decision, however, when it considered the second prong of its aider and abettor theory—knowledge of the primary violation on the part of the aider and abettor—the court found that "[a]t a minimum, the evidence firmly establishes recklessness on [the plaintiff's] part." In its first memorandum of decision, the trial court found the plaintiff to be *reckless* with respect to the untrue statement or omission of material fact. This factual finding would also require, as a lesser included state of mind, the conclusion that the plaintiff was *negligent* with respect to the untrue statement or omission of material fact.

pying a similar status or performing similar functions" pursuant to § 36-498 (c). He claims that liability is imposed by this phrase if a person occupies a similar status or performs similar functions to *a person liable under subsections (a) and (b)* of the same section. The trial court, however, interpreted the language differently. It concluded that liability would be imposed by this phrase only if a person occupies a similar status or performs similar functions to *a person who directly or indirectly controls a person liable* under subsections (a) and (b). The first question we must answer, therefore, before addressing the merits of this claim, is to whom must a person be similar in order to be held liable under this language. We disagree with the interpretation of both the trial court and John DePastino. We conclude, instead, that the proper inquiry is whether a person occupies a status or performs functions similar to the status and function of a partner, officer or director.

The pertinent language of § 36-498 (c) provides: "Every person who directly or indirectly controls a person liable under subsections (a) and (b) of this section, every partner, officer, or director of such a person, *every person occupying a similar status or performing similar functions*, every employee of such a person who materially aids in the act or transaction constituting the violation and every broker-dealer or agent who materially aids in the act or transaction constituting the violation are also liable . . . ." (Emphasis added.) See footnote 1 of this opinion. The first sentence of § 36-498 (c) creates secondary liability for certain people by identifying the relationship those people must have to another person in order to be secondarily liable. It also creates, by its construction, two ambiguities in interpretation. The initial ambiguity that arises from this sentence construction concerns to whom the secondarily liable person must have the described relationship in

order to be held liable. The second ambiguity is created by the absence of the phrase "of such a person" following the similar status and function language.

The first two clauses of § 36-498 (c) demonstrate the first ambiguity: "Every person who directly or indirectly controls a person liable under subsections (a) and (b) of this section, every partner, officer, or director of such a person . . . ." This ambiguity exists because it is unclear which "person" in the first clause serves as the antecedent for the words "of such a person" in the second clause. The plaintiff claims that the "control person" is the proper antecedent—that is, the "the person who directly or indirectly controls a person liable under subsection (a) and (b) . . . ." General Statutes (Rev. to 1993) § 36-498 (c). The defendants claim that the person liable under subsections (a) and (b) is the antecedent. We agree with the defendants that the person primarily liable is the antecedent for the words "of such a person."

The most persuasive evidence of the proper construction of the statute is found in the history of the statute's wording. When the legislature adopted the Uniform Act in 1977, the language of the statute was not as it is today. In fact, the language as adopted did not include the general ambiguity concerning the antecedent for "of such a person." See Public Acts 1977, No. 77-482. Prior to being amended by Public Acts 1987, No. 87-375, § 7 (P.A. 87-375), the first two clauses of General Statutes (Rev. to 1987) § 36-498 (b) provided: "Every person who directly or indirectly controls a *seller* liable under subsection (a) of this section, every partner, officer, or director of such a *seller* . . . ." (Emphasis added.) Under that revision of the statute, the person primarily liable under the act was a seller. The reference in the second clause—"of such a seller"—to the seller in the first phrase, therefore, made clear that the intended construction of this statute involved the relationship

between the person who was secondarily liable and the person who was primarily liable. Public Act 87-375, § 7, substituted "person" for "seller," presumably because there could be persons "liable under subsection (a)" who were not necessarily sellers. There is nothing in the linguistic changes wrought by P.A. 87-375, § 7, however, to indicate an intent to amend the intended referent of the second clause.

The "similar status" and "similar functions" language of § 36-498 (c), however, does not include the cause of the first ambiguity, namely, the phrase "of such a person." Indeed, it does not reference *any person* for the proposed comparative analysis. Hence, the second ambiguity. One possible interpretation of this phrase would be to read into its meaning the words "of such a person," which would make the phrase structurally equivalent to the other phrases in the compound subject. Although this interpretation has a certain symmetry to it, we do not adopt it. We conclude that the phrase "occupying a similar status or performing similar functions" contained in § 36-498 (c) refers to the phrase immediately before it—"partner, director, and officer"—and not to the person primarily liable.

Initially, we find support for our interpretation in CUSA itself. "[W]here the same words are used in a statute two or more times they will ordinarily be given the same meaning in each instance. . . . *Weinberg* v. *ARA Vending Co.*, [supra, 223 Conn. 343]." (Internal quotation marks omitted.) *Angelsea Productions, Inc.* v. *Commission on Human Rights & Opportunities*, supra, 236 Conn. 694. The last sentence of § 36-471 (2), namely, the definition of "agent," provides as follows: "A general partner, officer or director of a broker-dealer or issuer, or *a person occupying a similar status or performing similar functions*, is an agent only if he otherwise comes within this definition and any compensation that he receives is directly or indirectly related

to purchases or sales of securities." (Emphasis added.) In this definition, "similar status" and "similar functions" refer to partners, officers and directors. The combination of these two phrases in another section of the same act leads us to conclude that the "similar status" and "similar functions" language in § 36-498 (c) also refers to partners, officers and directors.[41] Thus, under § 36-498 (c), a party must occupy a status or perform a function similar to that of a general partner, officer or director in order to be held liable under this language in subsection (c).

Additionally, our conclusion is supported by the general structure of this section. Section 36-498 (c) expressly creates two types of secondary liability for securities fraud: control person liability; and aiding and abetting liability. *Arthur Young & Co.* v. *Reves*, 937 F.2d 1310, 1325 (8th Cir. 1991); *Norwest Bank Hastings* v. *Clapp*, 394 N.W.2d 176, 178–79 (Minn. App. 1986). Control persons such as partners, officers and directors logically fall under the control person heading. Employees, agents and broker-dealers logically fall under the aider and abettor heading because of the additional requirement in those sections that one materially aid in the act or transaction that constitutes the violation. If we were to interpret the statute as the defendants

---

[41] This interpretation also makes sense in that it provides a needed counterpart to the partner, officer and director category. If one wanted to avoid secondary liability under the partner, officer and director category, a simple change of title would suffice. With the "similar status" and "similar functions" language referencing the partner, officer and director category, however, the *substance* of one's position would determine liability, irrespective of title. The other categories described in § 36-498 (c), however, do not need the support of a reference to "similar status" or "similar functions." The control person category looks to the actual circumstances of control and not to any label. Both the employee and agent categories require that the person materially aid in the sale; again, there is a focus on the substance of the violation. It is only the partner, officer and director category that is defined by labels, and therefore it is the only category that requires a reference to "similar status" and "similar functions."

suggest—as creating liability for every person occupying a similar status or performing a similar function to a person primarily liable—we would be creating, in essence, aider and abettor liability without the requirement of material assistance, which is clearly a requirement for the other aiding and abetting categories. It is nowhere evident that the drafters of the Uniform Act or the legislature, when it adopted this language, intended to create such a broadly inclusive concept of aider and abettor liability.

Rather, it makes more sense to interpret the "similar status" and "similar functions" language as creating another type of control person, namely, one which references the phrase before it. Many of the cases that consider this section of the Uniform Act, as incorporated in state statutes, do consider the "similar status" and "similar functions" group a control person concept. See *Arthur Young & Co.* v. *Reves*, supra, 937 F.2d 1326; *Hayden* v. *McDonald*, 742 F.2d 423, 438 (8th Cir. 1984); *Robertson* v. *White*, 635 F. Sup. 851, 865 (W.D. Ark. 1986); see also J. Rediker, "Alabama's 'Blue Sky Law'— Its Dubious History and Its Current Renaissance," 23 Ala. L. Rev. 667, 714 (1971). We conclude that the proper analysis of the "similar status" and "similar functions" language in § 36-498 (c) considers whether a person occupies a similar status or performs a similar function to a partner, officer or director of a person liable under subsections (a) and (b) of § 36-498.

Because of our construction of the statute, we must reject this proposed alternate ground for affirmance of the trial court's decision. Although we do not dismiss the argument that, in a proper case, the "similar status" and "similar functions" language might provide a sufficient legal basis for sustaining control person liability, the trial court did not articulate a factual basis sufficient for us to conclude, as a matter of law, that the conduct fell within this language. In doing so, we emphasize

that this court reviews claims based on the record presented by the parties. Practice Book § 4061. We do not act as a fact finder in order to consider claims not decided at the trial level because "[t]he resolution of conflicting factual claims falls within the province of the trial court. . . . *Commissioner of Health Services* v. *Youth Challenge of Greater Hartford, Inc.*, 219 Conn. 657, 666, 594 A.2d 958 (1991)." (Internal quotation marks omitted.) *Rosenfield* v. *Metals Selling Corp.*, 229 Conn. 771, 788, 643 A.2d 1253 (1994); see also *McLaughlin* v. *Bronson,* supra, 206 Conn. 277–78; *State* v. *One 1981 BMW Automobile,* 15 Conn. App. 589, 599, 546 A.2d 879 (1988). The facts as found, after a trial on the merits and two memoranda of decision, do not permit an affirmance of the judgment of the trial court on the alternate ground that the plaintiff was secondarily liable under § 36-498 (c) as a "person occupying a similar status or performing similar functions."

C

As his final alternate ground for affirmance, John DePastino claims that the plaintiff is liable as a common-law aider and abettor. In support of this claim, he cites *Carney* v. *DeWees,* 136 Conn. 256, 262, 70 A.2d 142 (1949), for the proposition that this court has "recognized § 876 of the Restatement (Second) of Torts as an appropriate basis for the imposition of civil liability for aiding in the tortious conduct of another."[42] The

---

[42] The Restatement (Second) of Torts § 876 (1979) provides: "For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he

"(a) does a tortious act in concert with the other or pursuant to a common design with him, or

"(b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, or

"(c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person."

trial court's memoranda of decision, however, include inadequate findings to conclude that, as a matter of law, the plaintiff's conduct met the common-law definition of aiding and abetting tortious conduct. See *McLaughlin* v. *Bronson*, supra, 206 Conn. 277–78; *State* v. *One 1981 BMW Automobile*, supra, 15 Conn. App. 599. We, therefore, cannot affirm the judgment of the trial court on the alternate ground that the plaintiff is liable as a common-law aider and abettor of Great Rings.

Having decided with respect to John and Valerie DePastino that the plaintiff's conduct does not render it "a person occupying a similar status or performing similar functions" under § 36-498 (c) and does not render it a common-law aider and abettor, their CUSA defenses fail. This means that John DePastino has no defense on the promissory note underlying the action against him.[43]

D

We now address Santopietro's argument that we should affirm the judgment of the trial court as to him based upon the plaintiff's being a control person under § 36-498 (c). Santopietro claims that the factual record supports the conclusion that the plaintiff was a "person who directly or indirectly controls a person liable under subsections (a) and (b) of [§ 36-498]," and that the judgment for him should be affirmed on this alternate ground. The trial court, however, made a specific conclusion regarding the issue of control in this case. The court found that "[a]lthough the evidence plainly shows that [the plaintiff] gave substantial assistance to the Great Rings developers, it does not show whether [the plaintiff] controlled the developers or vice versa." In claiming on appeal that the plaintiff was a "control

---

[43] This also means that Valerie DePastino must rely on her UCC defense if she is to avoid liability on the promissory note underlying the action against her. We address that defense in part IV of this opinion.

person," Santopietro challenges the trial court's factual finding that the evidence was insufficient to establish such control. "The trial court's findings are binding upon this court unless they are clearly erroneous in light of the evidence and the pleadings in the record as a whole. . . . We cannot retry the facts or pass on the credibility of the witnesses. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Citation omitted; internal quotation marks omitted.) *Crowell* v. *Danforth*, 222 Conn. 150, 156, 609 A.2d 654 (1992); see also *Pandolphe's Auto Parts, Inc.* v. *Manchester*, supra, 181 Conn. 221–22. After a thorough review of the record, we cannot conclude that the trial court's finding was clearly erroneous. Santopietro's alternate ground for affirmance, therefore, fails.

III

The plaintiff contends, notwithstanding these conclusions, that § 36-498 (g) does not afford any of the defendants a defense to the plaintiff's action on the notes because, in the plaintiff's view, § 36-498 (g) only applies to contracts that are facially illegal, and not to contracts that, although facially valid, form part of a transaction constituting a CUSA violation. The plaintiff argues that § 36-498 (g) is modeled after § 29 (b) of the federal Securities Exchange Act of 1934,[44] and that federal cases

[44] Section 29 (b) of the federal Securities Exchange Act of 1934 provides in relevant part: "Every contract made in violation of any provision of this chapter or of any rule or regulation thereunder, and every contract (including any contract for listing a security on an exchange) heretofore or hereafter made, the performance of which involves the violation of, or the continuance of any relationship or practice in violation of, any provision of this chapter or any rule or regulation thereunder, shall be void (1) as regards the rights of any person who, in violation of any such provision, rule, or regulation, shall have made or engaged in the performance of any such contract, and

interpreting § 29 (b) render void only those contracts that by their terms violate that act. See, e.g., *Drasner v. Thomson McKinnon Securities, Inc.*, 433 F. Sup. 485, 501–502 (S.D.N.Y. 1977) ("[§ 29 (b)] only renders void those contracts which by their terms violate the [Securities Exchange] Act or the rules and regulations thereunder"). The Giacomi defendants contend that § 410 (g) of the Uniform Act, the precursor to § 36-498 (g), is not modeled after the federal statute, and argue that "the execution of the promissory notes was inextricably interwoven into the entire fraudulent securities transaction." The Santoro defendants cite to the public policy of protecting investors, which undergirds CUSA, and also argue that, under the plain language of § 36-498 (g), "it is the [plaintiff's] aiding in the violation of the securities laws in this case that constitutes 'the performance of [the] contract in violation' referred to in the statute." We agree with these defendants.

Section 36-498 (g) provides in relevant part: "No person who has made or engaged in the performance of any contract in violation of any provision of this chapter . . . may base any cause of action on the contract." Although the language, if read restrictively, would *permit* the interpretation offered by the plaintiff, it does not *compel* such an interpretation. Furthermore, the reference to the "performance" of the contract, in addition to the making of the contract, carries some linguistic suggestion that the language casts a broader net than posited by the plaintiff.

In addition, the remedial purpose of CUSA supports the conclusion that the scope of § 36-498 (g) encompasses not only a contract illegal on its face, but also

(2) as regards the rights of any person who, not being a party to such contract, shall have acquired any right thereunder with actual knowledge of the facts by reason of which the making or performance of such contract was in violation of any such provision, rule, or regulation . . . ." 15 U.S.C. § 78cc (b) (1988).

extends to the basic transaction underlying the contract. Section 36-498 (g) is the only provision in CUSA that would cover a situation like this, in which an aider and abetter of a primary CUSA violator seeks to reap the rewards of the contract—albeit facially valid—that constituted a principal method of the aiding and abetting. It is a more appropriate fit with CUSA's remedial purposes to read § 36-498 (g) to extend to such a transaction.[45]

We also find support for this position in *Criticare Systems, Inc.* v. *Sentek, Inc.*, 159 Wis. 2d 639, 649–50, 465 N.W.2d 216 (1990), in which the Court of Appeals of Wisconsin interpreted its version of § 410 (g) of the Uniform Act—the provision that bars actions by those who make or engage in the performance of contracts in violation of the act. The court rejected the view that the whole contract must violate the securities act before the defense would become operative. Id., 649. The court noted that "[t]he view that a contract must be found to be illegal per se before the statute can operate is not found in the statutes." Id., 649–50.

The question, therefore, is whether, in the making of the loans in question, the plaintiff's conduct constituted a violation of CUSA. As we have already described in detail, the plaintiff's endorsements of the Great Rings venture constituted its aiding and abetting a person who sells a security by means of an untrue statement of material fact. These offending statements were made during the making of the loans, which themselves were essential to the overall scheme of the Great Rings venture. As the trial court found, "[the plaintiff's] simple willingness to make these loans was an enormous sell-

___

[45] As we noted when we reviewed the legislative history in *Connecticut National Bank* v. *Giacomi*, supra, 233 Conn. 320, Public Act 77-482 was primarily concerned with creating new registration requirements. The legislative history of this section, therefore, does not indicate any intention regarding the scope of protection afforded by § 36-498 (g).

ing point . . . ." We conclude that the plaintiff's violations were inextricably tied to the making of these promissory notes. As the trial court noted when it paraphrased Judge Learned Hand, "[the plaintiff] associated itself with the venture, participated in it as something it wished to bring about, and sought by its actions to make it succeed. Its assistance was affirmative, substantial, and wrongful." We conclude, therefore, that because the plaintiff's conduct with respect to Robert Giacomi, Jack Giacomi, Joseph and Hope Santoro and Rosa, constituted a violation under CUSA, and that the violations of CUSA occurred in the making of the loans to the same defendants, the plaintiff may not maintain an action based on the promissory notes given by those defendants.

## IV

In its final issue on appeal, the plaintiff claims that the trial court improperly determined that Valerie DePastino[46] was discharged from her obligation on a promissory note pursuant to § 42a-3-407. See footnote 8 of this opinion. In support of its conclusion, the trial court found: that the promissory note signed by Valerie DePastino was an incomplete instrument under § 42a-3-115; see footnote 8 of this opinion; that the completion was unauthorized; that the alteration to the instrument was material under § 42a-3-407 (1); see footnote 8 of this opinion; and that the plaintiff was not a holder in due course because it had not given value for the instrument. See General Statutes (Rev. to 1991) § 42a-3-302 (1).[47] The plaintiff challenges the trial court's conclusions that Val-

[46] Valerie DePastino did not file a brief in this case. Therefore, any challenge to the trial court's decision regarding her first special defense; see footnote 7 of this opinion; is deemed waived.

[47] General Statutes (Rev. to 1991) § 42a-3-302 (1) provides: "A holder in due course is a holder who takes the instrument (a) for value; and (b) in good faith; and (c) without notice that it is overdue or has been dishonored or of any defense against or claim to it on the part of any person."

erie DePastino did not authorize the completion of the instrument and that the plaintiff is not a holder in due course, and asserts that her negligence in signing the note precludes her claim of an unauthorized material alteration.[48] The plaintiff also claims that Valerie DePastino was an accommodation maker on the instrument and is liable thereby pursuant to General Statutes (Rev. to 1991) § 42a-3-415.[49] Although we disagree with the trial court's conclusion that the plaintiff had not taken the note for value, we nonetheless affirm the judgment of the trial court with respect to Valerie DePastino.

## A

We begin our analysis of this issue by reviewing the trial court's determination that Valerie DePastino did not authorize the completion of the instrument. The trial court found the following: "There was plainly no

[48] General Statutes (Rev. to 1991) § 42a-3-406 provides: "Any person who by his negligence substantially contributes to a material alteration of the instrument or to the making of an unauthorized signature is precluded from asserting the alteration or lack of authority against a holder in due course or against a drawee or other payor who pays the instrument in good faith and in accordance with the reasonable commercial standards of the drawee's or payor's business."

[49] The plaintiff cites General Statutes § 42a-3-419 in support of its accommodation party argument. We, however, refer to General Statutes (Rev. to 1991) § 42a-3-415, the statute in effect during the circumstances of this case, which provides: "(1) An accommodation party is one who signs the instrument in any capacity for the purpose of lending his name to another party to it.

"(2) When the instrument has been taken for value before it is due the accommodation party is liable in the capacity in which he has signed even though the taker knows of the accommodation.

"(3) As against a holder in due course and without notice of the accommodation oral proof of the accommodation is not admissible to give the accommodation party the benefit of discharges dependent on his character as such. In other cases the accommodation character may be shown by oral proof.

"(4) An endorsement which shows that it is not in the chain of title is notice of its accommodation character.

"(5) An accommodation party is not liable to the party accommodated, and if he pays the instrument has a right of recourse on the instrument against such party."

express authority to complete the note. Whatever authority exists must be implied. [4 W. Hawkland & L. Lawrence, Uniform Commercial Code Series (1994) § 3-115:04]. Implied authority is often found from a subsequent receipt of the benefit of the note. *Milwaukee Petroleum Co.* v. *Glembin*, [89 Wis. 2d 174, 177, 278 N.W.2d 471 (App. 1979)]. Here, however, [Valerie] DePastino received no benefit from the note. Her signature on the check issued to John and her was forged. She at no time received a single penny as a result of the transaction. I find no implied authority to complete the instrument." The plaintiff claims that this finding is clearly erroneous. We disagree.

"Implied authority is actual authority circumstantially proved. It is the authority which the principal intended his agent to possess." (Internal quotation marks omitted.) *Czarnecki* v. *Plastics Liquidating Co.*, 179 Conn. 261, 268, 425 A.2d 1289 (1979). "Implied authority is a fact to be proven by deductions or inferences from the manifestations of consent of the principal and from the acts of the principal and [the] agent. *Fireman's Fund Indemnity Co.* v. *Longshore Beach & Country Club, Inc.*, 127 Conn. 493, 498, 18 A.2d 347 [1941] . . . ." (Citations omitted; internal quotation marks omitted.) *Hartford Accident & Indemnity Co.* v. *South Windsor Bank & Trust Co.*, 171 Conn. 63, 70, 368 A.2d 76 (1976).

"The trial court's findings are binding upon this court unless they are clearly erroneous in light of the evidence and the pleadings in the record as a whole. . . . We cannot retry the facts or pass on the credibility of the witnesses. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Citation omitted; internal quotation

marks omitted.) *Crowell* v. *Danforth*, supra, 222 Conn. 156; see also *Pandolphe's Auto Parts, Inc.* v. *Manchester*, supra, 181 Conn. 221–22. The trial court properly considered the facts and circumstances surrounding the transaction in question, including the lack of a benefit received by Valerie DePastino,[50] to determine whether the additions to the note were authorized. The trial court's determination that the additions to the instrument were unauthorized was not clearly erroneous.

### B

The plaintiff also challenges the trial court's determination that the plaintiff was not a holder in due course. The trial court stated: "The next question that must be addressed is whether the person seeking to enforce the instrument is a holder in due course. If it is, § 42a-3-407 (3) applies. If it is not, § 42a-3-407 (2) applies. [The plaintiff] is the person seeking to enforce the instrument. It is not a holder in due course. 'Holder in due course' is a term of art. It is defined by § 42a-3-302 (1) as, inter alia, 'a holder who takes the instrument (a) for value.' [The plaintiff] is the original issuer of the instrument in question here. It has not purchased the instrument from a prior holder. While a payee may be a holder in due course [under] § 42a-3-302 (2),[51] it may only become so by complying with the requirements contained in § 42a-3-302 (1). . . ." (Citation omitted.) The trial court did not specifically state why the plaintiff is not a holder in due course. It did, however, single out value, in its quotation of the statute that defines a holder in due course, as one of the elements of the test.

---

[50] The trial court reasonably found that Valerie DePastino never received a benefit from the note. Although the plaintiff issued a check jointly to her and her husband, she never received the benefits of that check. Her endorsement on the check was forged, and the proceeds from the check were used to purchase shares of Great Rings in her husband's name only.

[51] General Statutes (Rev. to 1991) § 42a-3-302 (2) provides: "A payee may be a holder in due course."

We infer from the trial court's memorandum of decision that it concluded that the plaintiff was not a holder in due course because it found that the plaintiff did not take the instrument for value. This finding was clearly erroneous.

General Statutes (Rev. to 1991) § 42a-3-303 provides in relevant part: "A holder takes the instrument for value (a) to the extent that the agreed consideration has been performed . . . ." In the present case, the agreed consideration was a check for $50,000, which the plaintiff duly issued jointly to John and Valerie DePastino on August 23, 1988. As far as the plaintiff's status as a holder in due course is concerned, the plaintiff took the note for value because it performed its obligation on the note. That Valerie DePastino received no benefit from the funds issued in consideration for the note is of no import to this question because there was no failure of consideration. See *Armstrong* v. *Armstrong*, 714 F. Sup. 451, 454 (D. Colo. 1989) ("[w]here, as here, there is no genuine dispute that [the comaker] received the proceeds of the [n]ote, as a matter of law, there can be no failure of consideration"). We conclude, therefore, that the plaintiff took the instrument for value.

The plaintiff, however, would have us conclude further that, as a matter of law, it is a holder in due course. See General Statutes (Rev. to 1991) § 42-3-302 (1); footnote 47 of this opinion. We decline to do so in the absence of factual findings to support such a conclusion. Although we acknowledge that the trial court could not find that the plaintiff had notice of Valerie DePastino's defense of unauthorized material alteration,[52] the trial court made no finding that the plaintiff took the instrument in "good faith" as defined by Gen-

[52] It is unclear from the trial court's finding which party bore the burden on this issue.

eral Statutes § 42a-1-201 (19).[53] "It is the sole responsibility of the appellant to provide an adequate record for review." *Keiser* v. *Conservation Commission*, 41 Conn. App. 39, 46, 674 A.2d 439 (1996); Practice Book § 4061. In addition, after a defense has been established, the party claiming the rights of a holder in due course bears the burden of proving all elements of that classification. See General Statutes (Rev. to 1991) § 42a-3-307 (3). From our review of the record, we cannot say that as a matter of law the plaintiff took the instrument in good faith. We conclude, therefore, that even though the trial court's determination that the plaintiff had not given value for the instrument was incorrect, its broader conclusion that the plaintiff was not a holder in due course must be affirmed.

Because we conclude that the plaintiff has not proven that it is a holder in due course, we do not reach the plaintiff's contention that, pursuant to General Statutes (Rev. to 1991) § 42a-3-406, Valerie DePastino's negligence in signing the note precludes her claim of an unauthorized material alteration. The three parties protected by the contributory negligence statute are a holder in due course, a drawee or other payor. See footnote 48 of this opinion. The plaintiff is neither a drawee nor a payor with respect to this instrument. The only possible classification to which the plaintiff can belong, therefore, is a holder in due course. As discussed previously, the plaintiff has not established that it is a holder in due course. The plaintiff's negligence claim, therefore, fails.

## C

The plaintiff also claims that Valerie DePastino was an accommodation party on the instrument, pursuant to § 42a-3-415; see footnote 49 of this opinion; and is liable

---

[53] General Statutes § 42a-1-201 (19) provides: " 'Good faith' means honesty in fact in the conduct or transaction concerned."

thereby. Section 42a-3-415 (1) defines an accommodation party as "one who signs the instrument in any capacity for the purpose of lending his name to another party to it." The trial court, however, made no finding regarding Valerie DePastino's status as an accommodation party, and the plaintiff did not request an articulation concerning this finding. "[I]t is the appellant's responsibility to provide an adequate record for review. See Practice Book § 4061; *Bank of Boston Connecticut* v. *Schlesinger*, 220 Conn. 152, 595 A.2d 872 (1991) . . . ." (Citations omitted; internal quotation marks omitted.) *Matza* v. *Matza*, 226 Conn. 166, 187, 627 A.2d 414 (1993). On the basis of the record before us, we cannot say that Valerie DePastino is an accommodation party.

The judgments for Robert Giacomi, Jack Giacomi, Joseph and Hope Santoro, Robert Rosa and Valerie DePastino are affirmed; the judgments for Joseph Santopietro and John DePastino are reversed, and those cases are remanded to the trial court with direction to render judgments for the plaintiff against those defendants, and for further proceedings to determine the amount of damages.

In this opinion NORCOTT, KATZ and MENT, Js., concurred.

BERDON, J., dissenting in part and concurring in part. The trial court found that the plaintiff, Connecticut National Bank, is barred from pursuing these actions against the defendants because it violated the provisions of the Connecticut Uniform Securities Act (CUSA), General Statutes (Rev. to 1993) § 36-470 et. seq.[1] More specifically, the trial court found that the plaintiff was barred from bringing actions to collect on

---

[1] As indicated in footnote 1 of the majority opinion, the provisions of CUSA were transferred and renumbered in 1995, and are currently codified at § 36b-2 et seq. References herein to the relevant provisions of CUSA are to their designations in effect during the period of time at issue in this case.

promissory notes made by the defendants in order to finance their purchases of units in the Great Rings Limited Partnership (Great Rings) because the plaintiff acted as an agent of the seller who perpetrated the fraud. The majority reverses the trial court on this theory of agency because it claims that under CUSA, the plaintiff, a corporate entity, cannot be an agent. In my view, the court's interpretation that only a natural person can be an agent under CUSA for a violation under General Statutes (Rev. to 1993) § 36-498 (c) is contrary to the plain language of CUSA, the intent of its drafters, and the beneficent purposes of CUSA.

I agree that the definitional section of CUSA, General Statutes (Rev. to 1993) § 36-471 (2), defines "agent" as "any individual . . . ." Nevertheless, the majority ignores the prefatory language of § 36-471 that those definitions will control *unless the context otherwise requires.* " (Emphasis added.) The context of § 36-498 (c) requires that the term "agent" as used therein includes a corporation for three reasons.

First, a common sense reading of § 36-498 (c) requires the construction that a corporation can be an agent. This becomes readily obvious when, in accordance with the statutory definition of "person" in § 36-471 (10),[2] "corporation" is substituted for person when reading § 36-498 (c), as follows: "Every [corporation] who directly or indirectly controls a [corporation] liable under subsections (a) and (b) of this section, every partner, officer, or director of such a [corporation], every [corporation] occupying a similar status or performing similar functions, every employee of such a [corporation] who materially aids in the act or transaction constituting the violation and every broker-dealer

---

[2] General Statutes (Rev. to 1993) § 36-471 (10) provides in relevant part: " 'Person' means an individual, a *corporation,* a partnership, an association, a joint-stock company . . . ." (Emphasis added.)

or agent who materially aids in the act or transaction constituting the violation are also liable jointly and severally with and to the same extent as such [corporation], unless the [corporation] who is so liable sustains the burden of proof that [it] did not know, and in exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist. . . ." The majority would have us believe that a corporation could be liable under CUSA when it aids the wrongdoer in the fraud, as clearly set forth in § 36-498 (c), but that a corporation would not be liable if it participated in the fraud as an agent of the wrongdoer. I cannot accept such a construction of § 36-498 (c). Further, the fact that § 36-498 (c) gives relief to the "agent," if "the [corporation] who is so liable sustains the burden of proof that [it] did not know, and in exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist," clearly indicates the legislature intended to include a corporation as an agent. Moreover, the last sentence of § 36-498 (c), providing for contribution among the "several [corporations] so liable," has obvious reference to an agent who is also subject to contribution. Accordingly, the term agent in the context of § 36-498 (c) must include a corporation because it is a "person" subject to contribution.

Second, the legislature could not have intended to limit agency liability under § 36-498 (c) to natural persons. "It is an accepted rule of statutory construction that the promulgators of statutes or rules do not intend to proclaim . . . ineffective rules or legislation. . . . It is also a rule of statutory construction that those who promulgate statutes or rules do not intend to promulgate statutes or rules that lead to absurd consequences or bizarre results." (Citations omitted.) *State* v. *Siano*, 216 Conn. 273, 278, 579 A.2d 79 (1990). Corporations

cannot act. They act through natural persons—their individual employees and officers. Reading "corporation" out of the definition of an agent in § 36-498 (c) can only lead, as in this case, to bizarre and ineffective results. In this case, the majority, through its narrow interpretation of CUSA, allows the plaintiff to profit through the wrongdoings of its officers, when those officers were acting on behalf of the plaintiff. Such an intent cannot be attributed to the legislature.

The absurd consequences of the majority's interpretation in this case is illustrated by the trial court's finding that "the evidence plainly shows that [the plaintiff], through its regional manager James Truelove and his secretary 'Freddie,' both effected and attempted to effect purchases or sales of . . . securities. . . . [Truelove] allowed [Kenneth] Zak and [Francis] Donnarumma [the principal promoters of Great Rings] to provide Great Rings investors with [the plaintiff's] financial statement forms. He was fully aware that . . . Zak and Donnarumma were touting the availability of . . . financing [from the plaintiff]. He plainly indicated to potential investors that [the plaintiff] was behind the investment. [Truelove] told Richard Carta that Great Rings was a good location and nice land and that Carta should be all right. His secretary 'Freddie' told Carta, Joseph Santoro, and John DePastino in their five minute meeting that he, Truelove, was aware of all that was going on. He gave Robert Rosa a note to sign, when he had never [previously] met Rosa, and uttered no denial when Rosa said that he was confident in the investment because the [plaintiff] had fully endorsed it. He told Robert Giacomi that he was very familiar with Great Rings, that the land in question was one of the most beautiful pieces of land in Connecticut, that he was thinking of purchasing one of the lots, and that Great Rings could not miss and was a 'homerun.' He told Jack Giacomi that Kenneth Zak was a 'pro' and that '[t]his

is a pretty good project, and everyone should make some money.' "

Finally, the beneficent purposes of CUSA require the construction that a corporation can be an agent. The comprehensive statutory scheme of CUSA, commonly known as the "blue sky law," "was adopted for the protection of investors in this state . . . [and they] should be *broadly and liberally construed* so as to effectuate the purpose of protecting the investing public from fraud." (Emphasis added.) *Shulansky* v. *Cambridge-Newport Financial Services Corp.*, 42 Conn. Sup. 439, 440–41, 623 A.2d 1078 (1991). Under the majority's approach, that public policy could be frustrated by corporations when they violate CUSA as agents through their officers.

In sum, the plain language of § 36-498 (c), the intent of the legislature, and the beneficent purposes of CUSA require us to conclude that the term "agent" includes corporations, such as the plaintiff, that materially assist in the sale of unregistered and unexempted securities to the public. In light of the convincing evidence of Truelove's material assistance in the Great Rings' scheme, it is no wonder that the plaintiff never raised this argument that a corporation cannot be an agent at trial, but raises it on appeal for the very first time.

I agree with the results reached in the majority opinion with respect to the defendants Robert Giacomi, Jack Giacomi, Joseph and Hope Santoro, Robert Rosa, and Valerie DePastino. Because I am of the opinion that the plaintiff is an agent under § 36-498 (c), and because I agree with the trial court's finding that the plaintiff as an agent "materially aid[ed] in the act or transaction constituting the violation," I disagree with the results with respect to the defendants John DePastino and Joseph Santopietro.